UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
DIVISION

**CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED**

November 05, 2025

**LAURA A. AUSTIN, CLERK
BY: /s/ Deneene King
DEPUTY CLERK**

| | |
|---|---|
| ANTHEM HEALTH PLANS OF VIRGINIA, INC. D/B/A ANTHEM BLUE CROSS AND BLUE SHIELD and HEALTHKEEPERS, INC.<br><br>Plaintiffs,<br><br>v.<br><br>AGS HEALTH, INC., THE SCHUMACHER GROUP OF LOUISIANA, INC. D/B/A SCP HEALTH, THE SCHUMACHER GROUP OF VIRGINIA, INC.; INGLESIDE EMERGENCY GROUP, LLC, KINGSFORD EMERGENCY GROUP, LLC, LAKE SPRING EMERGENCY GROUP, LLC, WESTERN VIRGINIA REGIONAL EMERGENCY PHYSICIANS, LLC, and WILDWOOD EMERGENCY GROUP, LLC,<br><br>Defendants. | Case No: 7:25-cv-00804<br><br>COMPLAINT<br>DEMAND FOR JURY TRIAL |

Plaintiffs Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield ("Anthem BCBS") and Healthkeepers, Inc. ("Healthkeepers") (Anthem BCBS and Healthkeepers, together, "Anthem") submit the following Complaint against AGS Health, Inc. ("AGS"); The Schumacher Group of Louisiana Inc. and The Schumacher Group of Virginia, Inc. (together, "SCP"); and a network of emergency medicine provider groups affiliated with SCP—Ingleside Emergency Group, LLC; Kingsford Emergency Group, LLC; Lake Spring Emergency Group, LLC; Western Virginia Regional Emergency Physicians, LLC; and Wildwood Emergency Group, LLC (collectively, the "Provider Defendants;" and, together with AGS and SCP, "Defendants" and members of the "SCP Enterprise"):

**INTRODUCTION**

1.      Congress enacted the No Surprises Act ("NSA") to protect Americans from abusive health care providers who engaged in the financially devastating practice of "surprise billing" for out-of-network services. For patients, the NSA provides important safeguards against surprise medical bills where they are not otherwise protected by state laws. For the SCP Enterprise, however, the NSA provides the opportunity to defraud health plans like Anthem.

2.      The NSA created an independent dispute resolution ("IDR") process to resolve certain types of surprise billing disputes between health plans and out-of-network providers. The NSA's IDR process is limited to "qualified IDR items or services" that meet strict eligibility criteria. For example, billing disputes are ineligible for the IDR process under the NSA where a specified state law—such as the Virginia Balance Billing Law, Va. Code Ann. § 38.2-3445.01 *et seq.*—protects the patient from a surprise medical bill and provides a method for determining the amount payable to the provider. But beginning no later than January 3, 2024, Defendants have engaged in a scheme to defraud Anthem by flooding the IDR process with disputes that are plainly ineligible for the federal process, including thousands that are subject to the Virginia Balance Billing Law, and reaping millions of dollars in wrongfully obtained awards.

3.      In furtherance of the NSA Scheme, Defendants (1) use interstate wires to submit knowingly false attestations of eligibility for services and disputes they know are ineligible for the IDR process, (2) strategically initiate massive volumes of IDR disputes simultaneously against Anthem to overwhelm the IDR process and push ineligible disputes to a payment determination, and (3) improperly inflate payment offers that far exceed commercially reasonable rates.

4.      Critically, Defendants knowingly make affirmative false attestations and representations to funnel ineligible disputes through the IDR process. Anthem's explanations of payment to the Provider Defendants inform them when services are subject to the Virginia Balance

Billing Law. When providers attempt to negotiate ineligible services as a prerequisite for the IDR

process, Anthem again notifies the provider that the claim is not governed by the federal NSA. But

Defendants then fraudulently bypass the regulatory safeguards intended to prevent providers from

inadvertently initiating the IDR process for ineligible disputes. That is, to proceed beyond the

initiation process, Defendants falsely attest that the services they seek to dispute are "qualified

item(s) and/or service(s) within the scope of the Federal IDR process." Defendants' knowingly

false representations and attestations of eligibility are necessary to access the IDR process and

force payors like Anthem into costly IDR proceedings that the system is designed to weed out.

5.      Defendants also initiate an avalanche of disputes against Anthem simultaneously

to overwhelm the IDR process and push their ineligible disputes to a payment determination. Their

practices include submitting over 950 separate IDR proceedings against Anthem on the same day,

nearly all of which were ineligible for the federal IDR process. Overall, nearly 60 percent of

disputes from Defendants that reached a payment determination were ineligible for the IDR

process. And Defendants' payment offers on these knowingly ineligible disputes are more than

535 percent of Anthem's qualifying payment amount ("QPA"), which generally represents the

median contract rate for the service.

6.      This fraudulent course of conduct is the product of a coordinated enterprise and

"strategic partnership" between Defendant SCP, the Provider Defendants, and Defendant AGS, all

of whom knowingly conspire to exploit the IDR process and fraudulently obtain exorbitant

payments for out-of-network services at the expense of Anthem and other health care payors. Each

of the Defendants has a crucial role in the fraudulent scheme.

7.      Defendant SCP operates nationwide through a closely-managed network of

subsidiaries and affiliated emergency medicine groups—like the Provider Defendants—that

contract with medical professional corporations and individual physicians to perform emergency services under SCP's control. SCP coordinates the infrastructure and staffing of emergency service providers like the Provider Defendants at hospitals and ambulatory surgical centers.

8. The Provider Defendants provide emergency services to patients. The Provider Defendants consist of entities controlled by SCP. They do not function independently. Instead, SCP directs material aspects of their operations, including the submission of IDR disputes, some of which they submit themselves, and others which they coordinate with AGS to submit.

9. AGS serves as the billing and revenue cycle manager for SCP and the Provider Defendants. SCP and the Provider Defendants supply the underlying claims and services for the submission to the IDR process, and AGS relies on artificial intelligence ("AI") and robotic process automation tools to collect revenue for the Provider Defendants' claims and services.

10. Through the SCP Enterprise, Defendants have unlawfully corrupted the IDR process for financial gain. They have conspired to systematically flood the IDR process—a process that Defendants know is susceptible to fraud and abuse—with knowingly ineligible disputes. Since no later than January 2024, Defendants have initiated thousands of knowingly ineligible disputes against Anthem. Knowing that these disputes on their face did not qualify for IDR, AGS and SCP, on behalf of the Provider Defendants, made false statements, representations, and attestations to fraudulently bypass IDR safeguards to take advantage of the IDR process. Against Anthem alone, Defendants have initiated over 27,000 IDR disputes involving almost 40,000 medical services since 2024. More than 16,000 of these disputes were ineligible for the IDR process.

11. Defendants' fraudulent scheme (referred to herein as the "NSA Scheme") violated the federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, as well as other federal and state laws, as set forth herein. Anthem brings this action against

Defendants—who, together and with other co-conspirators, known and unknown, engaged in the NSA Scheme as set forth herein—to end Defendants' ongoing criminal enterprise and recover resulting damages.

**THE PARTIES**

**I.     Plaintiff Anthem**

12.     Plaintiff Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield is licensed as a Health Maintenance Organization in Virginia, is incorporated in the Commonwealth of Virginia, and maintains a principal place of business at 2015 Staples Mill Road, Richmond, Virginia 23230.

13.     Plaintiff Healthkeepers, Inc. is licensed as a Health Maintenance Organization in Virginia, is incorporated in the Commonwealth of Virginia, and maintains a principal place of business at 2015 Staples Mill Road, Richmond, Virginia 23230.

**II.    The SCP Defendants**

14.     Defendant The Schumacher Group of Louisiana, Inc., d/b/a SCP Health, is a holding company whose subsidiaries and affiliates provide staffing and management services to hospitals and health care facilities, including in Virginia. It is incorporated in the State of Louisiana and maintains a principal place of business at 200 Corporate Blvd., Lafayette, Louisiana 70508 (the "Lafayette Address"). The Schumacher Group of Louisiana Inc.'s parent companies are: Onex TSG Intermediate Corp.; The Schumacher Group of Delaware, Inc.; Onex TSG Holdings II, Corp.; One TSG Holdings Corp.; Onex TSG/HPP Holdings Corp.; and Clinical Acquisitions Holdings, LP.

15.     Defendant The Schumacher Group of Virginia, Inc., is a provider of emergency and hospital medicine physician practice management services in Virginia. It is incorporated in the Commonwealth of Virginia and maintains a principal place of business at the Lafayette Address.

- 5 -

The Schumacher Group of Virginia Inc. is a subsidiary of Defendant The Schumacher Group of Louisiana, Inc.

### III.    The Provider Defendants

16.    Defendant Ingleside Emergency Group, LLC ("Ingleside") is a limited liability company that provides emergency medical services at LewisGale Hospital Alleghany in Low Moor, Virginia. It is incorporated in the Commonwealth of Virginia and maintains a principal place of business at the Lafayette Address, which is the same principal place of business as SCP. Ingleside was organized by Lisha Falk, SCP's Vice President of Contracting and Corporate Secretary,[1] on March 16, 2018. Ingleside is a subsidiary of Defendant The Schumacher Group of Louisiana, Inc.

17.    Defendant Kingsford Emergency Group, LLC ("Kingsford") is a limited liability company that provides emergency medical services at LewisGale Hospital Pulaski in Pulaski, Virginia. It is incorporated in the Commonwealth of Virginia and maintains a principal place of business at the Lafayette Address, which is the same principal place of business as SCP. Kingsford was also organized by Lisha Falk on March 16, 2018. Kingsford is a subsidiary of Defendant The Schumacher Group of Louisiana, Inc.

18.    Defendant Lake Spring Emergency Group, LLC ("Lake Spring") is a limited liability company that also provides emergency medical services at LewisGale Medical Center in Salem, Virginia. It is incorporated in the Commonwealth of Virginia and maintains a principal place of business at the Lafayette Address, which is the same principal place of business as SCP. Lake Spring was also organized by Lisha Falk on March 16, 2018. Lake Spring is a subsidiary of Defendant The Schumacher Group of Louisiana, Inc.

---

[1] https://www.linkedin.com/in/lisha-falk-45969b9b/.

19.    Defendant Western Virginia Regional Emergency Physicians, LLC ("Regional") is a limited liability company that provides emergency medical services at Norton Community Hospital in Norton, Virginia. It is incorporated in the Commonwealth of Virginia and maintains a principal place of business at the Lafayette Address, which is the same principal place of business as SCP. Regional was also organized by Lisha Falk on February 2, 2017. Regional is a subsidiary of Defendant The Schumacher Group of Louisiana, Inc.

20.    Defendant Wildwood Emergency Group, LLC ("Wildwood") is a limited liability company that provides emergency medical services at LewisGale Hospital Montgomery in Blacksburg, Virginia. It is incorporated in the Commonwealth of Virginia and maintains a principal place of business at the Lafayette Address, which is the same principal place of business as SCP. Wildwood was also organized by Lisha Falk on March 16, 2018. Wildwood is a subsidiary of Defendant The Schumacher Group of Louisiana, Inc.

## IV.    Defendant AGS

21.    Defendant AGS Health is a health care revenue cycle management company that is incorporated in the State of Delaware and maintains a principal place of business located at 1015 18th Street N.W., Washington, D.C. 20036.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, which gives federal district courts jurisdiction over civil RICO actions. This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under federal law, including the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, and the NSA, 42 U.S.C. § 300gg-111. The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

23.    Venue is proper in this District under 28 U.S.C. § 1391 because: (i) a substantial part of the events or omissions giving rise to the claims set forth herein occurred in, and were directed toward, this District; (ii) Anthem suffered injury by the events and omissions occurring in this District; and (iii) one or more of the Defendants reside here.

**BACKGROUND**

**I.    Anthem Administers Health Care Claims and IDR Proceedings for Members, Plan Sponsors, Government Programs, and BlueCard Plans.**

24.    Anthem offers a broad range of health care and related plans, insurance contracts, and services to its plan sponsors and "members" who enroll in an Anthem plan, including fully insured and self-funded employee health benefit plans. Anthem processes tens of millions of health care claims annually and is responsible for ensuring that claims are paid accurately and in accordance with plan terms. As a critical part of that responsibility, Anthem is authorized to undertake efforts to safeguard and protect itself, its members and insureds, and the various employer group health plans it administers from fraud, waste, and abuse—like the fraud Defendants are perpetrating here.

25.    Anthem administers claims and benefits for several different types of health care plans relevant to this Complaint.

26.    First, Anthem issues and administers health plans and insurance contracts, whereby Anthem collects premiums and is financially responsible for any benefits paid out under the plan terms or pursuant to law. Anthem sells these products either directly to consumers through the Virginia Health Benefit Exchange, or to small or large employer groups who offer coverage to their employees but do not themselves insure the loss under the plan. These products are typically subject to state regulation, including state laws prohibiting surprise billing and mandating payment for certain out-of-network claims.

27. Second, Anthem administers self-funded plans, typically offered by large employers to their employees. These employers self-insure the plan and are financially responsible for any payment of benefits or other losses. Because employers often lack infrastructure to provide health insurance to their consumers, these plans contract with Anthem to receive administrative services, such as provider network development, customer service, and claims pricing and adjudication. These plans often delegate authority to Anthem to administer the IDR process on behalf of the plans and discretionary authority to perform other services incident or necessary to Anthem's administration of the IDR process. The plans typically (though not always) reimburse Anthem for any awards resulting from IDR. While they may opt into following certain state insurance laws, such as state surprise billing laws, they otherwise are subject to ERISA and federal law. Relevant here, many self-funded plans administered by either Anthem BCBS or Healthkeepers have opted into the Virginia Balance Billing Law.

28. Third, Anthem administers government program claims, such as through the Medicare Advantage program or Medicaid managed care. Government-program claims are exempt from NSA requirements and are ineligible for IDR.

29. Fourth, pursuant to the BlueCard program, Anthem acts as a "Host Plan" to other independent Blue Cross and/or Blue Shield "Home Plans" whose members obtain treatment from providers in Anthem's service area in Virginia. As a Host Plan, Anthem manages and participates in IDR proceedings that are initiated by providers in Anthem's Virginia service area for non-Anthem plans whose members received treatment from the initiating Virginia provider.

30. While Anthem administers different types of health plans and claims, providers generally know what type of health care coverage the patient has. Providers require proof of insurance at the point of service to submit claims to the health plan, and the member's health

insurance card identifies the nature of the member's coverage. When Anthem issues an explanation of payment ("EOP") to the provider, the EOP typically includes information about the member's coverage, among other information.

## II.    Before the NSA, Out-of-Network Physicians Exploited American Consumers with Surprise Medical Bills.

31.    Health plans like Anthem contract with a network of health care providers, including hospitals and physicians, from whom their members may obtain "in-network" care. Such contracts govern the rate for the relevant services and prohibit the providers from billing patients above that amount. Generally, patients receive better and more affordable health care coverage when receiving treatment from in-network providers.

32.    Patients can also choose to obtain treatment from out-of-network providers, which have no contract with their health plan. Because out-of-network providers are not bound by contractual billing limitations, patients typically pay more when they elect to receive care from out-of-network providers. The health plan will cover a portion of the cost of the services, and the out-of-network provider will "balance bill" the patient for the difference between their "inflated," "non-market-based rates"—known as "billed charges"—and the amounts paid by health plans. H.R. Rep. No. 116-615 (2020), at 53, 57. Patients who choose to seek treatment from an out-of-network provider understand that it will likely be more expense than in-network care; they will likely receive less coverage from their health plan, and in turn, higher bills from their out-of-network provider.

33.    However, there are certain situations in which a patient has no ability to choose between in- and out-of-network care. One example is when a patient is suffering from a medical emergency and receives treatment at the nearest emergency room, where the on-call physician may not be in the patient's health plan's network. Before state and federal governments acted, out-of-

network emergency and hospital-based providers like the Provider Defendants and air ambulance providers capitalized on patients' lack of meaningful choice in these circumstances.

34.    These types of out-of-network providers widely engaged in the aggressive and financially devastating practice of "surprise billing." Specifically, the providers would exploit patients' inability to choose an in-network provider and bill the patient for the difference between their "inflated," "non-market-based" "billed charges" and the amounts paid by health plans. H.R. Rep. No. 116-615, at 53, 57. Surprise billing was particularly rampant among particular provider groups, including emergency providers like the Provider Defendants, who refused to contract with health plans because surprising billing yielded higher profits at the expense of patients who were not in a position to choose from whom they received such care.

35.    Before legislation banned their exploitative practices, surprise billing providers like the Provider Defendants held "substantial market power." H.R. Rep. No. 116-615, at 53. They were able to "charge amounts for their services that … result[ed] in compensation far above what is needed to sustain their practice" because they "face[d] highly inelastic demands for their services because patients lack[ed] the ability to meaningfully choose or refuse care." *Id.* Surprise billing providers like the Provider Defendants could reap massive profits by issuing surprise medical bills to patients, and they had little incentive to contract with health plans like Anthem to offer more affordable health care services to American consumers.

36.    Congress called this framework a "market failure" that was having "devastating financial impacts on Americans and their ability to afford needed health care." H.R. Rep. No. 116-615, at 52. In response to such abuses by providers, Congress—as well as many state legislatures like Virginia's—enacted laws to ban surprise medical bills.

**III.    The No Surprises Act Created an IDR Process to Determine a Rate for Specific Qualified IDR Items and Services.**

37.    Effective January 1, 2022, the NSA banned surprise billing for three categories of out-of-network care: (1) emergency services; (2) non-emergency services by out-of-network providers at in-network facilities; and (3) air ambulance services. *See* 42 U.S.C. §§ 300gg-131, 300gg-132, 300gg-135. To be subject to the NSA and the IDR process, health care services must fall into one of these three categories and meet other statutory and regulatory requirements described below.

38.    When enacting the NSA, Congress found "that any surprise billing solution must comprehensively protect consumers by 'taking the consumer out of the middle' of surprise billing disputes." H.R. Rep. No. 116-615, at 55. Thus, the NSA created a framework for health plans and providers to resolve specific types of eligible surprise billing disputes. *See* 42 U.S.C. § 300gg-111(c). The framework consists of (1) open negotiations—a required 30-business-day period to try resolving the dispute informally; (2) an IDR process for "qualified IDR items and services" if no agreement is reached; and (3) if applicable, a payment determination from private companies called certified IDR entities ("IDREs").

39.    When a health plan receives a claim for out-of-network services subject to the NSA (*i.e.*, emergency services, services provided at an in-network facility by an out-of-network provider, or air ambulance services), the health plan will make an initial payment or issue a notice of denial of payment within 30 days. *See* 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(I). The health plan's EOP includes, among other information, a phone number and email address for providers to seek further information or initiate open negotiations. *See* 45 C.F.R. § 149.140(d)(2).

40.    If the provider is dissatisfied with the initial payment, then the provider or its designee may initiate open negotiations with the health plan by providing formal written notice to

- 12 -

the health plan within 30 business days of the initial payment or notice of denial. 42 U.S.C. § 300gg-111(c)(1)(A). After initiating open negotiations, the provider must attempt in good faith to negotiate a resolution with the health plan over the 30-business-day open negotiations period. *See id.*

41.     If the provider initiates and exhausts the 30-day open negotiations period, and "the open negotiations … do not result in a determination of an amount of payment for [the] item or service," then the provider may initiate the IDR process. *See* 42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(b)(2)(i). The IDR process is used "to determine the [out-of-network] rate for qualified IDR items or services after an unsuccessful open negotiation period."[2] The IDR process is only available to providers who first initiate and exhaust open negotiations with the health plan. *See id.* Providers must initiate the IDR process within four business days after the 30-day open negotiations period has been exhausted. *See id.*

42.     The 30-day open negotiations period is a central requirement of the IDR process. Indeed, Congress explained that one of the primary purposes of the NSA was to ensure that health care providers (including hospitals and doctors) and payors (including insurance companies and self-funded plans), are incentivized to resolve their differences amongst themselves.[3]

43.     The IDR process is also only available for a "qualified IDR item or service" eligible for the process. 42 U.S.C. § 300gg-111(c)(1); 45 C.F.R. § 149.510(a)(2)(xi), (b)(1), (b)(2). To be considered a qualified IDR item or service within the scope of the IDR process, the following conditions must be met:

---

[2]     Centers     for     Medicare     &     Medicaid     Services,     available     at https://www.cms.gov/nosurprises/policies-and-resources/reports (last visited Sept. 26, 2025).
[3] *See* Brady Opening Statement at Full Committee Markup of Health Legislation (Feb. 12, 2020), available     at     https://waysandmeans.house.gov/2020/02/12/brady-opening-statement-at-full-committee-markup-of-health-legislation-3/ (last visited September 4, 2025).

a. The underlying services are within the NSA's scope, meaning they are out-of-network emergency services, non-emergency services at participating facilities, or air ambulance services;

b. The services involve a patient with health care coverage through a group plan or health insurer subject to the NSA (*e.g.*, not coverage through government programs like Medicare or Medicaid);

c. A state surprise billing law (referred to as a "specified state law" in the NSA) does not apply to the dispute;

d. The underlying services were covered by the patient's health benefit plan (*i.e.*, payment was not denied);

e. The patient did not waive the NSA's balance billing protections;

f. The provider initiated and exhausted open negotiations;

g. The provider initiated the IDR process within four business days after the open negotiations period was exhausted; and

h. The provider has not had a previous IDR determination on the same services and against the same payor in the previous 90 calendar days.

42 U.S.C. § 300gg-111(c)(1); 45 C.F.R. § 149.510(a)(2)(xi), (b)(2).

44.    With the NSA, Congress did not intend to supplant specified state laws. Congress lauded the fact that at the time the NSA was enacted, more than half of states had already "taken significant steps to address surprise medical bills through consumer protection laws that shield patients from surprise billing in the individual, small group, and fully-insured group markets." H.R. Rep. No. 116-615, at 54. Congress enacted the NSA to supplement state laws, not replace them. *See id.* If the state law already protects the patient from the surprise medical bill and provides a method of determining the out-of-network rate for the services, then the state law applies, and the dispute is not eligible for the NSA. 42 U.S.C. § 300gg-111(a)(3)(H)-(K), (c)(1); 49 C.F.R. § 149.510(a)(2)(xi)(A).

45.    The Virginia Balance Billing Law, Va. Code Ann. §§ 38.2-3445.01 *et seq.*, is one such specified state law. The Virginia Balance Billing Law bans out-of-network providers from

issuing surprise medical bills for (1) emergency services or (2) nonemergency surgical or ancillary services provided at an in-network facility. Va. Code Ann. § 38.2-3445.01(A). The Virginia Balance Billing Law also provides a method of determining the out-of-network rate for the services in the event of a payment dispute. *See* Va. Code Ann. § 38.2-3445.02.

46.     The Centers for Medicare & Medicaid Services ("CMS"), the federal agency within the Department of Health and Human Services ("HHS") that is primarily charged with implementing the IDR process on behalf of the Departments,[4] has issued several resources to aid interested parties in determining whether a state surprise billing law exists.[5] And, as discussed below, Anthem informs providers like the Provider Defendants when the Virginia Balance Billing Law applies.

47.     When initiating the IDR process, providers must, among other things, submit an attestation that the items and services in dispute are qualified IDR items or services within the scope of the IDR process. *See* 45 C.F.R. § 149.510(b)(2)(iii)(A)(6).[6] A copy of the IDR initiation form, including the attestation, is provided to the non-initiating party, the IDRE, and the Departments.[7]

---

[4] "Departments" includes the Departments of Health and Human Services ("HHS"), Labor ("DOL"), and Treasury.

[5] *See, e.g.,* Consolidated Appropriations Act ("CAA") Enforcement Letters, available at https://www.cms.gov/marketplace/about/oversight/other-insurance-protections/consolidated-appropriations-act-2021-caa; Chart for Determining the Applicability for the Federal Independent Dispute Resolution (IDR) Process (Jan. 13, 2023), available at https://www.cms.gov/files/document/caa-federal-idr-applicability-chart.pdf.

[6] *See also* Notice of IDR Initiation Form, U.S. Dep't of Labor, available at https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/no-surprises-act/notice-of-idr-initiation.pdf.

[7] The "Departments" include HHS, the Department of Labor, and the Department of Treasury.

**IV.    The IDR Initiation Process Notifies Parties of Ineligible Disputes.**

48.    Parties must initiate the IDR process online through a federal "IDR Portal." The website for submissions is https://nsa-idr.cms.gov/paymentdisputes/s/.

49.    The online process for initiating IDR is designed to notify initiating parties of ineligible disputes and prevent parties from inadvertently initiating the IDR process for ineligible items or services.

50.    The first page of the website specifies that parties may "[u]se this form if you participated in an open negotiation period that has expired without agreement for an out-of-network total payment amount for the qualified IDR item or service."

> Use this form if you participated in an open negotiation period that has expired without an agreement for an out-of-network total payment amount for the qualified IDR item or service.
>
> You can start the Federal Independent Dispute Resolution (IDR) process within 4 business days after the end of the 30-business-day open negotiation period if a determination of the total payment for the qualified IDR item(s) or service(s), including cost-sharing, wasn't reached.
>
> You will need to **provide information for both parties involved** in the dispute.

51.    The first page also provides a link to a list of states with specified state laws that render certain disputes ineligible for the IDR process:

> Review the IDR State list to determine which states will have processes that apply to payment determinations for the items, services, and parties involved. FEHB plans are subject to the Federal IDR process unless OPM contracts with FEHB carriers to include terms that adopt state law as governing for this purpose.

52.    Before initiating the IDR process, parties must agree to certain terms and conditions. The terms and conditions include a notice that the initiating party must submit an "[a]ttestation that qualified IDR items or services are within the scope of the Federal IDR process."

**Before starting:**

You may need to provide information by uploading separate documents. The total file size limit for all uploaded documents is 500MB. Be sure your files meet this limitation.

Along with the general information you'll need to start your Federal IDR dispute process, provide:

- Information to identify the qualified IDR items or services (and whether they are designated as batched or bundled items or services)
- Dates and location of qualified IDR items or services
- Type of qualified IDR items or services such as emergency services and post-stabilization services
- Codes for corresponding service and place-of-service
- Attestation that qualified IDR items or services are within the scope of the Federal IDR process
- Your preferred certified IDR entity

53.     After agreeing to the terms and conditions, initiating parties must answer certain "Qualification Questions" through an online form. If the answers to the Qualification Questions indicate that the dispute is not eligible for IDR, the form will provide an alert and prevent the initiating party from proceeding.

54.     For example, one of the key Qualification Questions on the federal IDR website asks when the party began the open negotiation process. That question as it appears on the website is below.



- 17 -

55.     Parties must exhaust the 30-business-day open negotiation period before either party may initiate the federal IDR process. If the initiating party enters a date that is not at least 31 days before the date of website submission, the federal IDR website will not permit the initiating party to proceed and seek payment for the service.

56.     The initiating party must also upload proof of open negotiation. To push an ineligible dispute past this step, the initiating party must upload a fictitious document to support a fabricated open negotiation start date.

57.     Further, if the IDR initiation is not within four business days of the end of the 30-day open negotiation period, the initiating party must provide a reason why it is eligible for an extension and provide supporting documentation.

58.     After successfully completing the Qualification Questions, the initiating party is asked to complete the Notice of IDR Initiation Form. The initiating party must provide a variety of information, including the name and contact information of the health care provider, the claim number, the date of the service, the QPA—generally the plan's median in-network rate for the same service in the same geographic area—for the qualified IDR item or services at issue, and documentation supporting these facts.

59.     At the end of this process, the submitting party must attest, via electronic signature, that the "item(s) and/or service(s) at issue are qualified item(s) and/or services(s) within the scope of the Federal IDR process."



60.     A copy of the Notice of IDR Initiation—including the initiating party's attestation that the "item(s) and/or service(s) at issue are qualified item(s) and/or services(s) within the scope of the Federal IDR process"—is provided to the non-initiating party (*i.e.*, the health plan), the IDRE, and the Departments.

61.     As illustrated above, at every stage of this online process, the initiating party must make false statements to submit a dispute for services that are not eligible for IDR, or the initiation process cannot continue. As such, when a party initiates the IDR process, it has full knowledge of the requirements and limits of the IDR process.

62.     HHS administers the IDR initiation process. Any submission made through this system is a statement made to the federal government, and any attestation made as part of the submission process is also made to the federal government. False attestations to the federal government can violate 18 U.S.C. § 1001.

63.     Defendants' false statements, attestations, and misrepresentations were aimed at Anthem in order to fraudulently obtain payments from Anthem to Defendants for out-of-network services to which they were not legally entitled to payment. Anthem justifiably relied on these

false statements, attestations, and misrepresentations, causing Anthem to pay Defendants more than they otherwise would have been required to pay.

**V.    Anthem Also Informs Providers of Ineligible Disputes, Including Those Subject to Virginia's Balance Billing Law.**

64.    In addition to the mechanisms built into the IDR initiation process to weed out ineligible claims, Anthem also affirmatively sends multiple communications informing providers when services are ineligible for the NSA's IDR process.

65.    For example, Anthem's EOPs use the code "ARS" to inform providers that a claim's items and services are subject to Virginia's balance billing laws and are therefore ineligible for the federal IDR process. The description of the ARS code, which is printed on the EOP, states, among other things, that "*[t]his was adjusted to follow Virginia's balance billing laws and rules.*"

| ARS | This was adjusted to follow Virginia balance billing laws and rules. Payment reflects the amount paid based on the member's benefits when they receive care from a doctor/facility in their plan's network. If you disagree with our decision and have documents to support the claim, from Availity.com select the Claims & Payments tab to access Claims Status. Find the claim and select the Dispute button. As a reminder, the member is not responsible for the amount due. |
| --- | --- |

66.    When providers initiate negotiations for services subject to the Virginia Balance Billing Law, Anthem notifies the provider that the "*claim is not governed by the Federal No Surprises Act.*"

> The Independent Dispute Resolution (IDR) team with Anthem received a request for negotiation on 11/27/2024 , regarding the below referenced claim(s). Unfortunately, we are unable to process your request for negotiation due to the following marked reasons:

 Claim is not governed by the Federal No Surprises Act.

67.    And even when providers ignore Anthem's EOP and negotiations communications for items and services subject to the Virginia Balance Billing Law, Anthem informs the provider

or designee that the items or services are "***ineligible for IDR under the NSA because a state surprise billing law applies***."

> The Independent Dispute Resolution (IDR) Team has received an IDR initiation notice for the above DISP Number. After review, the claim(s) is/are out of the scope (OOS) of the Federal No Surprises Act (NSA), due to the following reason(s). Please refer to the addendum for more information.
>
> ☑ The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies. Per CMS guidelines, where a specified state law provides a method for determining the total amount payable for out-of-network items and services, providers may not engage in the federal IDR process for resolving payment disputes under the NSA.

68.     Like the Qualification Questions and IDR initiation process, Anthem's communications of ineligibility in the EOP, during open negotiations, and after IDR initiation ensure that providers do not mistakenly pursue the IDR process for non-qualified items or services that are outside the scope of the process.

**VI.     If Applicable, IDREs Make Payment Determinations Subject to Judicial Review in Certain Specified Circumstances.**

69.     After the provider initiates the IDR process, the parties select, or HHS appoints, an IDRE. 42 U.S.C. § 300gg-111(c)(4)(F). The IDRE performs two tasks.

70.     *First*, the IDRE is directed by regulation (though not by the Act itself) to "determine whether the Federal IDR process applies." 45 C.F.R. § 149.510(c)(1)(v). In making this determination, the IDRE is directed to "review the information submitted in the notice of IDR initiation" with the provider's attestation of eligibility. 45 C.F.R. § 149.510(c)(1)(v). In practice, this is a cursory review by the IDRE based on incomplete, one-sided information. The layers of safeguards in the IDR initiation process—including the Qualification Questions and provider attestations—are intended to prevent parties from initiating the IDR process with ineligible disputes at the outset, before the dispute reaches the IDRE. Once a dispute reaches the IDRE, the initiating party has already bypassed those safeguards and affirmatively attested to the eligibility

- 21 -

of the dispute, and the IDRE reviews the notice of IDR initiation with the affirmative attestation to determine eligibility. *See id.*

71. *Second*, if the IDRE determines the IDR process applies, then the IDRE proceeds to a payment determination. 42 U.S.C. § 300gg-111(c)(5)(A). The IDRE's payment determination must involve "a qualified IDR item or service." *Id.*

72. IDR payment determinations resemble a baseball-style dispute resolution where the provider and health plan each submit an offer, and the IDRE selects one party's offer as the out-of-network rate. 42 U.S.C. § 300gg-111(c)(5)(B). The parties submit "blind" offers; Anthem does not get an opportunity to review, verify, or rebut the provider's offer.

73. In making its determination, the IDRE must consider the QPA—which approximates the health plan's median in-network contracting rate for the services—and several "additional circumstances," such as training, experience, and quality of the provider, its market share, and the acuity of the patient, among others. 42 U.S.C. § 300gg-111(c)(5)(C). IDREs cannot consider, among other things, the provider's charges. 42 U.S.C. § 300gg-111(c)(5)(D) (IDREs "shall not consider … the amount that would have been billed by such provider or facility …"). Congress reasoned that permitting IDREs to "consider non-market-based rates such as the providers' billed charges … may drive up consumer costs." H.R. Rep. No. 116-615, at 57.

74. The NSA states that an IDR determination for a "qualified IDR item or service" is "binding" unless there was "a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim[.]" 42 U.S.C. § 300gg-111(c)(5)(E)(i).

75. The NSA also states that an IDR determination for a "qualified IDR item or service" "shall not be subject to judicial review, except in a case described in any of paragraphs (1) through

(4) of section 10(a) of title 9." 42 U.S.C. § 300gg-111(c)(5)(E)(II). Paragraphs (1) through (4) of section 10(a) of title 9 describe:

(a) where the award was procured by corruption, fraud, or undue means;

(b) where there was evident partiality or corruption in the arbitrators, or either of them;

(c) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any behavior by which the rights of any party have been prejudiced; or

(d) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4).

76.    Parties to IDR proceedings are responsible for payment of two fees. First, both parties must pay a non-refundable administrative fee—currently $115—when the dispute is initiated. This fee is not recoverable even when the IDRE determines that the dispute does not qualify for IDR, or even when the initiating party later voluntarily withdraws the dispute. Second, both parties must pay an IDRE fee before the IDRE makes the payment determination. The IDRE fee is set by the specific IDRE and depends on the type of IDR submitted, but ranges from $200 to $1,173. The party whose offer is selected by the IDRE is refunded its IDRE fee, meaning it is only responsible for the $115 administrative fee. The non-prevailing party is responsible for both the administrative fee and the IDRE fee.

77.    Notably, IDREs are only compensated when a dispute reaches a payment determination. *See* 42 U.S.C. § 300gg-111(c)(5)(F). They do not receive compensation when dismissing a dispute due to the ineligibility of the service. *See id.* And because IDREs are

compensated on a per-dispute basis, they receive greater compensation when there are a greater total number of disputes.

## VII. Virginia's Balance Billing Law Has Led to Balanced Results, while the NSA's IDR Process Skews Heavily in Favor of Providers.

78.     At the time Congress enacted the NSA, Virginia had already enacted legislation to protect Virginians from surprise medical bills from providers like the Provider Defendants. The Virginia Balance Billing Law bans out-of-network providers from issuing surprise medical bills for (1) emergency services or (2) nonemergency surgical or ancillary services provided at an in-network facility. Va. Code Ann. § 38.2-3445.01(A).

79.     The Virginia Balance Billing Law broadly applies to enrollees of fully insured health plans issued in Virginia, enrollees of state employee health plans, and enrollees of self-funded group health plans that have opted into the Virginia law. *See* Va. Code Ann. §§ 38.2-3445.01, 38.2-3445.06; *see also* Virginia CAA Enforcement Letter (Dec. 21, 2021), available at https://www.cms.gov/cciio/programs-and-initiatives/other-insurance-protections/caa-enforcement-letters-virginia.pdf. The Virginia State Corporation Commission ("SCC") provides on its website a public list of all self-funded group health plans that have opted into the Virginia Balance Billing Law.

80.     Pursuant to the Virginia Balance Billing Law, health plans will compensate out-of-network emergency, surgical, and ancillary providers for services subject to the Act according to "a commercially reasonable amount, based on payments for the same or similar services provided in a geographic area." Va. Code Ann. § 38.2-3445.01(F).

81.     The SCC contracts with a nonprofit data service, Virginia Health Information, to establish a data set "to assist with determining commercially reasonable payments and resolving payment disputes for out-of-network medical services rendered by health care providers." *Id.* at

§ 38.2-3445.03(A). The data set and business protocols are "developed in collaboration with health carriers and health care providers" and are reviewed by an advisory committee. *Id.* at § 38.2-3445.03(B).

82.    The Virginia Balance Billing Law further establishes a framework for resolving provider disputes over the payment rate. Like the NSA, this framework features (1) negotiations, (2) a "baseball style" dispute resolution process, and (3) a decision from an arbitrator that requires payment of one of the party's final offer. Va. Code Ann. §§ 38.2-3445.01, 38.2-3445.02. However, the two processes have key differences and wildly disparate results.

A.    **The Virginia Balance Billing Law Controls for Dispute Volume, While the NSA Does Not.**

83.    To control the volume of disputes and prevent abuse and exploitation, the Virginia Balance Billing Law provides that "no carrier or provider shall initiate arbitration pursuant to § 38.2-3445.02 with such frequency as to indicate a general business practice." Va. Code Ann. § 38.2-3445.05(D).

84.    In less than a year after the Virginia Balance Billing Law was enacted, the SCC "determined that certain provider groups are filing arbitration requests with such frequency as to indicate a general business practice."[8] One such provider group was SCP.

85.    In response, the SCC immediately limited providers to filing "[n]o more than one (1) arbitration request per provider group (or sole health care professional not part of a provider group) during a seven (7) day period."[9] The SCC specified that "[t]his is an aggregate limit, meaning separate requests are not permitted from the same provider group (or sole health care

---

[8]    *See* Administrative Letter 2021-04 (Nov. 22, 2021), available at https://www.scc.virginia.gov/media/sccvirginiagov-home/regulated-industries/insurance/insurance-companies/life-health-companies/balance-billing/21-04.pdf.

[9] *Id.*

professional who is not part of a provider group) during any seven-day period regardless of geographic area, CPT code, or carrier involved."[10]

86.    The Virginia Balance Billing Law allows providers to "bundle claims for arbitration," ensuring that providers can pursue arbitration for claims that they wish to arbitrate and still abide by the Virginia Balance Billing Law's filing limitations. *See* Va. Code Ann. § 38.2-3445.02(B).

87.    The SCC reported that pursuant to the Virginia Balance Billing Law, there were 246 reported decisions in 2023, 268 reported decisions in 2024, and 252 reported decisions in 2025.[11]

88.    The NSA's IDR process, on the other hand, has been overwhelmed by a staggering volume of disputes that far exceeds the government's estimates.

89.    Before the NSA's IDR process was launched, CMS estimated that parties would initiate about 22,000 IDR process disputes in the first year. *See* 86 Fed. Reg. 55,980, 56,068, 56,070 (Oct. 7, 2021).

90.    Providers have shattered those estimates. The most recent government statistics show that in the second half of 2024, disputing parties—virtually all of whom are providers—initiated 853,374 disputes, 40 percent more than the first half of 2024 (610,498).[12] This figure from six months is nearly 39 times the volume of disputes that the government originally anticipated over a full year.

---

[10] *Id.*

[11] *See Health Insurance Balance Billing Arbitration Annual Report*, SCC (July 2025), available at https://www.scc.virginia.gov/media/sccvirginiagov-home/consumer-home/insurance/life-amp-health/balance-billing-protection/2025-balance-billing-arbitration-process-annual-report.pdf.

[12] *Supplemental Background on the Federal IDR Public Use Files, July 1, 2024—Dec. 31, 2024* (as of May 28, 2025), available at https://www.cms.gov/files/document/federal-idr-supplemental-background-2024-q3-2024-q4.pdf.

91.    Government reporting also shows that most disputes are initiated by a small number of providers and their representatives. The top ten initiating parties initiated about 71 percent of all disputes initiated in the last six months of 2024, and the top three initiating parties initiated about 43 percent of all disputes during that period. *Id.*

92.    Notably, AGS and SCP are among the five most prolific filers of IDR process disputes. During the last six months of 2024, SCP initiated no fewer than 81,010 disputes through the IDR process—which by itself exceeded the government's original estimate for total annual disputes more than sixfold.[13] That means that SCP was initiating an average of more than 443 IDR process disputes against health plans per day.

**B.    The Virginia Balance Billing Law Promotes Transparency with Offers, Arbitrators, the Arbitrator Selection Process, and the Arbitrator's Decision, while the NSA's IDR Process Does Not.**

93.    To achieve more balanced results, the Virginia Balance Billing Law promotes transparency with offers, arbitrators, the arbitrator selection process, and the arbitrator's decision.

94.    For example, when a provider initiates the Virginia Balance Billing Law arbitration process, it must complete a Notice of Intent to Arbitrate Form.[14] The Notice of Intent to Arbitrate Form must include, among other information, (1) the amount billed for the services, (2) the health plan's allowed amount for the service, (3) the amount the health plan offered prior to arbitration, (4) the provider's final offer during negotiations, and (5) the provider's final offer with the request

---

[13] *See Federal IDR Supplemental Tables for Q3 2024* (as of May 28, 2025), available at https://www.cms.gov/files/document/federal-idr-supplemental-tables-2024-q3.xlsx; *Federal IDR Supplemental Tables for Q4 2024* (as of May 28, 2025), available at https://www.cms.gov/files/document/federal-idr-supplemental-tables-2024-q4-may-28-2025.xlsx.

[14] *See* Notice of Intent to Arbitrate, available at https://www.scc.virginia.gov/media/sccvirginiagov-home/regulated-industries/insurance/insurance-companies/life-health-companies/balance-billing/notice-arbitration-requested_form_922.pdf.

to arbitrate.[15] The Notice of Intent to Arbitrate Form is provided to the SCC, the non-initiating party, and the arbitrator so both parties and the arbitrator have a complete picture of the claims in dispute, the efforts to negotiate the payment rate, and the provider's final offer at the outset of the arbitration.

95.     By contrast, the NSA's IDR process initiation forms do not reveal the amount billed for the service or any details regarding the parties' offers during the negotiation period. In the IDR process, the health plan also has no insight into the provider's final offer for the services until after the IDRE has made a payment determination.

96.     In addition, the Virginia Balance Billing Law uses individual arbitrator candidates to resolve disputes. The SCC's website lists 76 arbitrator candidates with resumes available for the candidates.[16] Each arbitrator must complete the SCC's mandatory arbitrator training, have experience with medical or health care services, have experience with arbitration, and maintain a professional license in good standing, such as a professional license in medical coding.[17]

97.     Conversely, the NSA's IDR process uses 15 IDRE companies to resolve payment disputes. Disputing parties have virtually no information about the individuals at the IDREs who are deciding the payment disputes or their credentials.

98.     To select an arbitrator per the Virginia Balance Billing Law, the parties either agree on one of the arbitrator candidates or the SCC submits five candidates for the parties'

---

[15] *See id.*

[16] *See* Arbitrator Search, SCC, available at https://www.scc.virginia.gov/balancebilling#/Arbitrators.

[17] *See* SCC Arbitration Training PowerPoint, available at https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.scc.virginia.gov%2Fmedia%2Fsccvirginiagov-home%2Fregulated-industries%2Finsurance%2Finsurance-companies%2Flife-health-companies%2Fbalance-billing%2F12-16-21-arbitration-training-powerpoint.pptx&wdOrigin=BROWSELINK.

consideration. Va. Code Ann. § 38.2-3445.02(C). Each party may research the candidates' background, credentials, and resumes on the SCC's website and strike up to two candidates.[18]

99.    Conversely, under the NSA's IDR process, the parties either agree on (or fail to object to) a proposed IDRE, or HHS will select one without the parties' input. *See* 42 U.S.C. § 300gg-111(c)(5)(F); 42 C.F.R. § 149.510(c)(1)(i).

100.    Arbitrator decisions per the Virginia Balance Billing Law also promote transparency and focus on objective metrics. Arbitrators must issue a written decision to the parties and report details of the arbitration to the SCC. Va. Code Ann. § 38.2-3445.02(E), (I). The SCC encourages arbitrators to include in their written decision to the parties:

- A restatement of each party's position and final offer;

- A description of the information submitted by each party, identifying the party who submitted the information;

- A discussion of how the information provided by the parties did or did not support the arbitrator's decision;

- A discussion of why the selected offer is a commercially reasonable amount <u>based on payments for similar services provided in a similar geographic area</u>;

- If Virginia's commercially reasonable data set was not used in the arbitrator's decision, an explanation of why not, and a reference to the specific data that was used, including information about the circumstances of the data, such as whether similar patient characteristics existed, services were rendered in a similar geographic area, and similar services were provided; and

---

[18] *Id.*; *see Arbitrator Search*, SCC, available at https://www.scc.virginia.gov/balancebilling#/Arbitrators.

- Any suggestions to the parties about how they can improve their written submissions.[19]

101.    Under the NSA's IDR process, on the other hand, IDREs typically provide payment determinations on a standard form with generic language. Studies show that IDRE decision making varies widely, and "the rationale behind payment determinations remains unclear due to limited transparency into how IDR entities evaluate submissions."[20]

### C.    The Virginia Balance Billing Law Has Led to Balanced Results, while the NSA's IDR Process Does Not.

102.    Publicly available reporting from the SCC and CMS show that the Virginia Balance Billing Law leads to balanced results, while the NSA's IDR process skews heavily in favor of providers.

103.    According to the most recent reporting period from May 15, 2024, to May 15, 2025, the SCC received 252 arbitrator decisions.[21] Of the total arbitration decisions rendered, 55 percent were decided in favor of health plans, and 45 percent were decided in favor of the provider. *See id.* The average amount awarded per emergency provider claimant was $439.[22]

---

[19] Virginia Arbitrator Decision Reporting Form, SCC, available at https://www.scc.virginia.gov/media/sccvirginiagov-home/regulated-industries/insurance/insurance-companies/life-health-companies/balance-billing/arbitrator-decision-reporting-form.pdf (emphasis in original).

[20] *No Surprises Act Arbitrators Vary Significantly in Their Decision Making Patterns*, Health Affairs, available at https://www.healthaffairs.org/content/forefront/no-surprises-act-arbitrators-vary-significantly-their-decision-making-patterns.

[21] *See Health Insurance Balance Billing Arbitration Annual Report*, SCC (July 2025), available at https://www.scc.virginia.gov/media/sccvirginiagov-home/consumer-home/insurance/life-amp-health/balance-billing-protection/2025-balance-billing-arbitration-process-annual-report.pdf.

[22] *See id.*

104.   The Virginia College of Emergency Physicians has lauded the Virginia Balance Billing Law, noting that it has led to "medical practices and insurers [ ] finding a middle ground about what providers should be paid—which was the ultimate goal."[23]

105.   By contrast, the NSA's IDR process skews heavily in favor of providers. In the most recent reporting period, providers prevailed in 85 percent of IDR payment determinations.[24] During that period, prevailing offers exceeded the QPA 85 percent of the time. *See id.* In the most recent reporting period, for line items in which the provider prevailed, the median payment determination was 459 percent of the QPA.[25] Moreover, the average amount awarded for emergency evaluation and management services was $2,268—more than five times the average amount awarded per emergency provider claimant under the Virginia Balance Billing Law's arbitration process.[26]

106.   The NSA's IDR process has also incurred billions in additional costs. From 2022 to 2024, the IDR process has led to at least $5 billion in total costs.[27] Of the $5 billion, $2.24 billion in costs arose from payment determinations in favor of the provider.[28] Administrative and IDR entity fees total $884 million.[29] "[T]he high costs will add to overall health system costs and will

---

[23] *See Surprise Billing Arbitration: It's Working!*, Virginia College of Emergency Physicians, available at https://www.vacep.org/news-blog/surprise-billing-arbitration-its-working.

[24] *Supplemental Background on the Federal IDR Public Use Files, July 1, 2024—Dec. 31, 2024*, CMS, *supra*.

[25] *See Independent Dispute Resolution Reports, Federal IDR PUF for 2024 Q4 (as of May 28, 2025)*, CMS, available at https://www.cms.gov/nosurprises/policies-and-resources/reports.

[26] *See id.*

[27] *The Substantial Costs of the No Surprises Act Arbitration Process*, Health Affairs, available at https://www.healthaffairs.org/content/forefront/substantial-costs-no-surprises-act-arbitration-process.

[28] *Id.*

[29] *Id.*

ultimately be paid by consumers."[30] While providers are responsible for a portion of the fees, they must find them worth the cost, considering the likelihood of a higher award than they otherwise get on claims properly submitted through the Virginia Balance Billing Law.

107. To date, the Virginia Balance Billing Law's process and results show transparency, balance, and efficiency. The NSA's IDR process, conversely, is susceptible to fraud, waste, and abuse by Defendants.

108. But the law is clear: Defendants cannot choose whether they dispute out-of-network payments via the Virginia Balance Billing Law or the NSA's IDR process. But through the fraudulent NSA Scheme, Defendants submitted thousands of knowingly ineligible disputes through the NSA's IDR process, including those clearly subject to the Virginia Balance Billing Law, because they know the NSA's IDR process is susceptible to exploitation and abuse.

## **DEFENDANTS' FRAUDULENT NSA SCHEME**

109. Beginning no later than January 2024, Defendants launched the NSA Scheme to defraud Anthem by knowingly and fraudulently submitting thousands of disputes with Anthem to the NSA's IDR process that by law must be decided under the Virginia Balance Billing Law or that were otherwise ineligible under the NSA. To effectuate this scheme, Defendants made false statements, representations, and attestations regarding the claims' eligibility for IDR under the NSA.

110. The SCP Enterprise consists of SCP, the Provider Defendants, and AGS, who associated together with the common purpose of engaging in a course of conduct to conduct the NSA Scheme. The core of the NSA Scheme relies on the SCP Enterprise's calculated bet: that their repeated misrepresentations that the submitted disputes met the criteria for the federal IDR

---

[30] *Id.*

process would not be caught. And they were not. Nearly 60 percent of the disputes initiated by Defendants against Anthem that reached a payment determination were ineligible for the IDR process. As a result of these ineligible disputes, Anthem's records show that since 2024 Defendants have fraudulently secured improper IDR awards totaling millions of dollars.

111.     The IDR process is only available for specific categories of disputes, subject to strict statutory and regulatory criteria. However, Defendants submit false attestations through the IDR Portal claiming eligibility for disputes involving (1) services and disputes already governed by the Virginia Balance Billing Law, (2) disputes for which Defendants failed to initiate or pursue open negotiations, and (3) disputes already resolved or barred by timing rules.

112.     Defendants have pulled off the NSA Scheme by exploiting technology such as AI and robotic process automation. Using AGS's AI and robotic process automation tools in IDR submissions, the Provider Defendants, in coordination with AGS, have flooded the IDR system with disputes at an industrial scale, deliberately overwhelming IDR safeguards and enabling payment on their fraudulent disputes. Indeed, Defendant AGS publicly admits that it uses "bots" to "log into portals, and submit offers" in the IDR Portal.[31]

113.     Defendants' NSA Scheme involves three related tactics. *First*, using interstate wires, Defendants make repeated false representations and attestations of eligibility to Anthem, the IDREs, and the Departments. *Second*, Defendants manipulate the IDR process by leveraging technology and strategically submitting massive numbers of open negotiations and IDR initiations—most of which are patently ineligible for IDR—in an attempt to bypass the safeguards of the IDR process, overwhelm the ability of health plans like Anthem to contest claims, and

---

[31] *See* AGS Health, *Leveraging Automation to Manage the No Surprises Act Dispute Process* (Dec. 7, 2023), https://www.agshealth.com/blog/leveraging-automation-to-manage-the-no-surprises-act-dispute-process/.

similarly confuse and swamp IDREs. *Third*, Defendants submit inflated and commercially unreasonable requests for payment that they could never receive on the open market.

114.    Through the NSA Scheme, Defendants intentionally turned the NSA's IDR process into the vehicle for their fraud scheme.

**I.  Defendants Knowingly Make False Statements, Representations, and Attestations of Eligibility to Fraudulently Initiate the IDR Process.**

115.    When flooding the IDR process with ineligible disputes against Anthem, the Provider Defendants, in coordination with AGS, make repeated false statements, representations, and attestations that the items or services in dispute are "qualified item(s) and/or service(s) within the scope of the Federal IDR process" when, in fact, they know they are not. 45 C.F.R. § 149.510(b)(2)(iii)(A)(6).[32] Defendants make these false attestations and representations to Anthem, the IDREs, and the Departments.

116.    The items and services that Defendants falsely attest are "qualified item(s) and service(s) within the scope of the Federal IDR process" are patently ineligible, and Defendants know that they are ineligible when making their false attestations. As noted above, the online process for initiating IDR is designed to—and does—notify initiating parties of the kinds of disputes that are ineligible, including when they are ineligible because of a specified state law, to prevent them from submitting ineligible items or services. And Anthem frequently communicates that services are ineligible in its EOPs, during open negotiations, and after Defendants initiate the IDR process for ineligible services.

117.    For example, Defendants know when services are subject to the Virginia Balance Billing Law and are therefore ineligible for the IDR process. Anthem's EOPs communicate that

---

[32] *See also* Notice of IDR Initiation Form, U.S. Dep't of Labor, available at https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/no-surprises-act/notice-of-idr-initiation.pdf.

services are subject to the Virginia Balance Billing Law. When Defendants open negotiations for services subject to the Virginia Balance Billing Law, Anthem informs them that the claim is not governed by the federal NSA. To prevent parties from inadvertently initiating the IDR process for services subject to a specified state law like the Virginia Balance Billing Law, the first page of the IDR initiation process (1) provides a link to information listing states—like Virginia—that have surprise billing laws that may render the NSA inapplicable, and (2) informs initiating parties that they must submit an attestation that the services at issue are qualified IDR items or services within the scope of the Federal IDR process. And before initiating the IDR process, Defendants affirmatively attest that the services are "qualified item(s) and/or services(s) within the scope of the Federal IDR process." Defendants submit these fraudulent attestations with full knowledge of their falsity to exploit the NSA's IDR process with disputes clearly subject to the Virginia Balance Billing Law and defraud Anthem.

118.    As another example, Defendants knowingly submit thousands of disputes for services where no open negotiation occurred. As part of the IDR initiation process, initiating parties must also identify, among other things, the specific date that they initiated open negotiations and the type of health plan coverage for the patient who received the services, and affirmatively attest that the "item(s) and service(s) at issue are qualified items and/or service(s) within the scope of the Federal IDR process." In order to push their ineligible services through the IDR process, Defendants must affirmatively make false statements; if they do not, the system prevents them from proceeding with their ineligible claims. Of course, the IDR Portal cannot tell when the provider misrepresents information about the relevant plan, service, or dispute because it relies on truthful and accurate submissions by initiating parties. Defendants take advantage of this vulnerability in the system to carry out the NSA Scheme.

- 35 -

119.    In addition, even when Defendants manage to push through ineligible disputes through submitting false statements to the federal IDR Portal, Anthem often directly notifies Defendants that the items or services at issue in their IDR initiation violate the NSA's eligibility requirements. Yet, despite receiving this information, Defendants routinely proceed with their IDR disputes anyway—demonstrating not only their knowledge of the fraud, but their intentional and ongoing participation in it.

120.    Such disputes cannot proceed through the IDR Portal by inadvertence or neglect on the part of Defendants. But Defendants knowingly make false statements and representations to get past this step by fabricating a start date for the open negotiation period and/or by generating a fictitious justification for an extension. Each of Defendants' online submissions to the Departments and the IDRE for these ineligible disputes constitutes an overt act in furtherance of their wire fraud scheme; Defendants had to input misrepresentations about the type of plan, service, or nature of the dispute and falsely attest that the "item(s) and service(s) at issue are qualified items and/or service(s) within the scope of the Federal IDR process" to overcome the IDR system's safeguards and get their disputes submitted.

121.    SCP, or AGS in coordination with SCP and the Provider Defendants, make these false attestations of eligibility when initiating the IDR process for services performed by the Provider Defendants, with the full knowledge of each Defendant, and in furtherance of the NSA Scheme.

122.    In sum, AGS, SCP and the Provider Defendants are fully aware of the false attestations that AGS submits in their names and actively participate in the scheme by coordinating with AGS on the submissions. This coordination is deliberate, sustained, and central to the execution of the NSA Scheme.

**II.     Defendants Strategically Initiate a Massive Volume of Fraudulent IDR Disputes Simultaneously.**

123.    To further ensure that the thousands of knowingly ineligible, falsely-attested to disputes against Anthem go undetected and proceed to payment determination, Defendants also initiate a massive number of IDR disputes all at once to overwhelm the IDR system. They use AI and robotic process automation, including bots to do this. This abuse of volume is not incidental; it is strategic to secure favorable or default outcomes when health plans have insufficient time to challenge eligibility, and IDREs cannot complete fulsome reviews in the timeline provided by the NSA, in furtherance of the NSA Scheme—in other words, for the very reasons the Virginia Balance Billing Law prohibits this behavior.

124.    As noted, the NSA's IDR process has been overwhelmed by a staggering volume of disputes that far exceed the government's initial estimates. Initiating parties—nearly all of whom are providers—initiated nearly 1.5 million IDR proceedings in 2024. A small number of provider groups, including SCP, have disproportionately initiated the vast majority of these disputes; in the most recent data period, SCP averaged filing more than 443 disputes against health plans per day.

125.    But AGS, SCP and the Provider Defendants did not merely initiate an overwhelming volume of IDR disputes. On numerous occasions, Defendants strategically initiated hundreds of IDR disputes against Anthem on the same day, most of which were fraudulent and did not involve qualified IDR items or services within the scope of the NSA's IDR process.

126.    For example, on September 25, 2024, Defendants initiated *954* separate IDR proceedings against Anthem. Anthem's records show that *943* of the disputes were not eligible for IDR in the first place. Yet Anthem lost in 329 of those ineligible disputes—which had been submitted with false attestations of eligibility by Defendants—where the IDREs ordered Anthem

to pay an additional $340,387 from what was originally reimbursed, plus the $181,999 in fees associated with the IDR process that Anthem had to pay. And even in the disputes where Anthem "won"—*i.e.*, where Anthem's bid was selected by the IDRE—Anthem is still harmed by the NSA Scheme, because it must still pay the IDR administrative fees and is forced to participate in a dispute resolution process it is by law not required to engage in. The IDR's baseball-style dispute resolution process, wherein the IDRE has no authority to modify the parties' bids, is premised on the notion that ineligible claims will be weeded out at the outset.

127.    Defendants' goals are to interfere with Anthem's ability to effectively identify ineligible disputes and to overwhelm the IDR system and the IDREs tasked with making applicability and payment determinations.

128.    According to federal law, "the certified IDR entity selected must review the information submitted in the notice of IDR initiation"—including Defendants' false attestations of eligibility—"to determine whether the Federal IDR process applies." 45 C.F.R. § 149.510(c)(1)(v). IDREs have no incentive to dismiss disputes due to ineligibility because they only receive compensation if a dispute reaches a payment determination. *See* 42 U.S.C. § 300gg-111(c)(5)(F). Defendants exploit this incentive structure to carry out their fraudulent scheme.

129.    Thus, when receiving an avalanche of ineligible disputes from Defendants all at once, IDREs frequently rely on Defendants' false attestations of eligibility to reach and issue a payment determination on ineligible disputes.

130.    Since at least 2024, nearly 60 percent of disputes initiated by Defendants against Anthem that reached a payment determination were ineligible for the IDR process, often despite objections from Anthem. From these fraudulent submissions alone, Defendants have received millions of dollars in illicitly obtained reimbursements from Anthem.

**III.    Defendants Submit Commercially Unreasonable Payment Offers to Inflate Payments on IDR Disputes.**

131.    The last step in Defendants' NSA Scheme involves inflating their reimbursement demand to levels far beyond what the market would support. Their goal is to manipulate IDREs into selecting inflated amounts by anchoring the dispute to a grossly exaggerated number. By submitting a grossly inflated offer—sometimes through "bots"—Defendants artificially shift the IDRE's frame of reference upward. And due to systemic issues with the IDR process, Defendants frequently prevail with their unreasonable offer, even if it is far above market rates.

132.    Congress directed IDR payment determinations to be made according to the QPA and several "additional circumstances," such as the training, experience, and quality of the provider, its market share, and the acuity of the patient, among others. 42 U.S.C. § 300gg-111(c)(5)(C). In practice, however, IDRE payment determinations skew heavily in favor of providers and heavily in excess of the QPA because providers like Defendants are exploiting the system.

133.    In the most recent reporting period, providers prevailed in 85 percent of IDR payment determinations.[33] For line items in which the provider prevailed, the median payment determination was 459 percent of the QPA. The average amount awarded for emergency evaluation and management services was $2,268, more than five times the average amount awarded per emergency provider claimant under the Virginia Balance Billing Law's arbitration process.

134.    Defendants know that IDREs select the provider's offer in more than eight out of every ten payment determinations, so they can frequently prevail with outrageous offers.

---

[33] *Supplemental Background on the Federal IDR Public Use Files, July 1, 2024-Dec. 31, 2024*, CMS, *supra*.

135.    Indeed, since 2024, Defendants' payment offers on ineligible disputes alone are more than 535 percent of Anthem's QPA for the service.

136.    These amounts far exceed what the Provider Defendants could expect to receive for their services from patients or from health plans in a competitive market and far exceed the amount that would be recovered under applicable state surprising billing laws. But through their scheme to exploit the IDR process, Defendants' systematic requests for these exorbitant amounts intentionally exploit the IDR process for undue gains at Anthem's expense.

## IV.    Defendants' NSA Scheme Damaged Anthem, Affiliated Health Plans, and Consumers.

137.    As a result of Defendants' unlawful conduct, Anthem and its affiliated health plans have paid excessive amounts for medical services and incurred unnecessary administrative and IDRE fees. The financial harm caused by Defendants' abusive practices is ongoing. Not only does it damage Anthem, but it threatens the affordability and sustainability of health benefits for Anthem's members.

138.    From January 2024, to August 2025, Anthem's records show that Defendants initiated tens of thousands of IDR proceedings against Anthem. However, Defendants' NSA Scheme likely began earlier. Publicly available data from CMS shows that the Provider Defendants were parties to IDR determinations against Anthem at least as early as 2023.

139.    Anthem determined that nearly 60 percent of the IDR disputes were ineligible for IDR for reasons like failure to initiate mandatory open negotiations, failure to timely submit the dispute to the IDR process, or Virginia's balance billing laws governed the dispute. For these ineligible disputes catalogued in Anthem's data, Defendants illicitly secured millions of dollars in improper IDR awards from Anthem.

140.    Defendants' exploitation of the IDR process is contributing to billions of dollars in additional costs. From 2022 to 2024, the IDR process has led to at least $5 billion in total costs.[34] Of the $5 billion, $2.24 billion in costs arose from payment determinations in favor of the provider.[35] Administrative and IDR entity fees total $884 million.[36] "[T]he high costs will add to overall health system costs and will ultimately be paid by consumers."[37]

### THE SCP ENTERPRISE

141.    The members of the SCP Enterprise were organized pursuant to a framework that enabled the enterprise to make and carry out decisions. The SCP Enterprise functioned as a continuing unit with established duties. The SCP Enterprise designed and coordinated the multifaceted NSA Scheme intended to defraud payors like Anthem.

142.    In doing so, AGS, SCP, and the Provider Defendants conducted the activities of an association-in-fact enterprise consisting of AGS, SCP, and the Provider Defendants through a pattern of racketeering activity, including, but not limited to, wire fraud.

143.    Between January 2024 and the present, the Provider Defendants, with the intent to defraud, devised and willfully participated with AGS and SCP, and with knowledge of its fraudulent nature, in the scheme and artifice to defraud and obtain money and property by materially false and fraudulent pretenses, statements, and representations, as described herein.

144.    Defendants do not operate as separate, independent actors. Rather, they function as interdependent participants in a unified scheme designed to exploit the IDR process and defraud

---

[34] *The Substantial Costs of the No Surprises Act Arbitration Process*, HEALTH AFFAIRS, available at https://www.healthaffairs.org/content/forefront/substantial-costs-no-surprises-act-arbitration-process.

[35] *Id.*

[36] *Id.*

[37] *Id.*

Anthem. The Provider Defendants are integrated components of SCP, a national emergency and hospitalist staffing enterprise that centrally manages legal, billing, and IDR functions. AGS serves as an operational partner of the enterprise, submitting disputes on behalf of the Provider Defendants at scale using a standardized platform and shared communications infrastructure. Their coordinated actions, mutual financial incentives, and repeated patterns of conduct demonstrate a shared intent to pursue improper IDR payments on a mass scale. AGS, SCP and the Provider Defendants operated with integrated, enterprise-level coordination behind the scheme.

## I.   Defendant SCP

145.    Formerly known as Schumacher Clinical Partners, Defendant SCP is a national emergency and hospital physician staffing company that operates in more than 30 states, managing physician practice groups that serve over 400 hospitals. SCP claims to "support local care teams with national resources," offering "a fully outsourced solution" for staffing hospitals with emergency physicians.[38]

146.    SCP's business model revolves around tightly controlling its affiliated entities, setting billing practices, directing claims strategies, and orchestrating strategic relationships with third-party vendors like AGS, which enables SCP to take advantage of the IDR process as it has in the NSA Scheme.

147.    SCP exercises managerial and operational control over its subsidiaries and contracted and affiliated physicians and provider groups, including the Provider Defendants. SCP directs their staffing, sets their compensation, trains them on documenting medical records, employs coders to code and bill claims for their services, and (individually or through AGS)

---

[38] *See Emergency Medicine*, SCP Health, available at https://www.scphealth.com/services/emergency_medicine/.

initiates IDR proceedings to seek additional payments for their services. These entities are nominally separate but in substance operate as wholly controlled subsidiaries or affiliates of SCP.

148.    SCP's control over contracted and affiliated provider entities like the Provider Defendants has been publicized in the multiple lawsuits that physicians and provider groups have filed against SCP and its affiliates. For example, in Virginia, an emergency room physician filed suit against two of the Provider Defendants, Ingleside and Kingford, alleging that she was dropped from the schedule in retaliation for her refusal to upcharge her services as critical care when the services did not meet the criteria under medical coding guidelines to justify the higher level of coding that would have resulted in additional reimbursement to the facility.[39]

149.    As another example, a California emergency physician group that contracted with an SCP affiliate filed a False Claims Act lawsuit alleging that SCP (1) "pressured providers into charting for critical care services when the threshold for such services has not been met," (2) "trained its coders, who work out of SCP Health's corporate headquarters, to look in patient charts for opportunities to bill services as critical care, even if the providers had not initially coded their services as critical care," and (3) uses its own coders to "'upcode[ ]' non-critical care to a higher, more profitable level of non-critical care" without input from the physicians. *Kenley Emergency Medicine v. The Schumacher Grps. of La. Inc.*, No. 20-cv-03274-SI (N.D. Cal.), at ECF No. 105.

150.    The Provider Defendants are all affiliated with SCP, which centrally coordinates their emergency services and manages coding, billing, and IDR functions.

---

[39] *Hanover doctor's lawsuit claims private equity has overrun emergency medicine*, Richmond Times Dispatch, available at https://richmond.com/news/local/government-politics/hospital-emergency-room-michelle-hollis-hca-whistleblower-schumacher-clinical-partners/article_17dd5646-acf8-11ef-bea1-930211bca59d.html#tracking-source=mp-homepage (published Dec. 3, 2024).

## II.     The Provider Defendants

151.     The SCP Enterprise relies on the Provider Defendants' out-of-network services provided to patients in this Judicial District as the basis for initiating fraudulent IDR proceedings.

152.     The Provider Defendants are emergency service providers affiliated with SCP. They direct and control the out-of-network services provided to patients which become the claims that are the lifeblood of the NSA Scheme.

153.     SCP's control over the Provider Defendants is indisputable. SCP and the Provider Defendants share:

- The same principal office address—the Lafayette Address—the corporate headquarters of SCP;

- The same authorized official, Lisha Falk (Vice President of Contracting and Corporate Secretary at SCP), who signed the Articles of Formation for each entity and is listed on their NPI records as the corporate representative;

- A single point of contact for all billing, payment, appeals, and correspondence—regardless of the named provider entity—either a Texas PO Box affiliated with SCP or SCP's headquarters in Louisiana; and

- Use of @scp-health.com or @agshealth.com email domains on all IDR submissions and correspondence.

154.     The Provider Defendants are corporate instruments of SCP, managed centrally from Lafayette, and—through SCP's management—are operated in lockstep with AGS to carry out the enterprise's revenue-maximizing and harmful NSA Scheme.

- 44 -

### III.    Defendant AGS

155.    AGS offers the means by which the SCP Enterprise floods the IDR process with knowingly ineligible disputes. AGS is the billing and revenue cycle manager for SCP and its affiliated providers, including the Provider Defendants (at SCP's direction). AGS leverages automation tools to submit disputes for services rendered by the Provider Defendants in this Judicial District and billed by SCP through the IDR process on a mass scale. AGS publicly advertises its "strategic partnership" with SCP, boasting of its ability to reduce SCP's cost to collect by more than 28 percent through automation and the implementation of a new "arbitration process"[40] for challenging reimbursement shortfalls. In AGS's own words, the companies work with "a shared mindset" and collaborate "to brainstorm solutions."[41]

156.    AGS openly markets its use of "Robotic Process Automation" to engage in the IDR process. AGS touts its use of automation and "distinctive methodology" to streamline the IDR process for its clients. This includes applying intelligent workflow tools to manage timelines and document submissions, thereby reducing administrative burdens, and improving dispute outcomes for their clients. Specifically, AGS uses "bots" to actually log into the IDR Portal and even submit offers, and AGS publicly admits that it does so because "[a]utomation *can help scale* the process

---

[40] Although Defendants use the term "arbitration," it is not used in the true sense of the word, as the IDR dispute resolution process is not used to determine liability; rather, it serves only to pick a number for reimbursement amount. *See, e.g.*, CMS, available at https://www.cms.gov/nosurprises/policies-and-resources/reports (last visited Sept. 26, 2025) ("The No Surprises Act (NSA) and its implementing regulations established a Federal Independent Dispute Resolution (IDR) process that out-of-network (OON) providers . . . may use *to determine the OON rate* for qualified IDR items or services after an unsuccessful open negotiation period.") (emphasis added).

[41] *See* AGS Health White Paper, *Partnering for Transformation: SCP Health Reduces Costs by 28 percent*, https://www.agshealth.com/whitepapers/partnering-for-transformation-scp-health-reduces-costs-by-28/?utm_campaign=Social%20Media%20Content%20Promotion&utm_content=289651792&utm_medium=social&utm_source=linkedin&hss_channel=lcp-2205744 (last accessed July 10, 2025).

by enabling [the bots] to handle high volumes of requests and data processing . . . ."[42] In its own words, "AGS Health is more than a revenue cycle management company … Our distinctive methodology blends award-winning services with intelligent automation and high-touch customer support to deliver peak end-to-end revenue cycle performance[.]"[43]

> **Scalability:** The dispute process can be complex and time-consuming, especially for large healthcare providers. Automation can help scale the process by enabling digital workers to handle high volumes of requests and data processing to help improve efficiency and reduce costs.

157.    These tools are not simply administrative—they are the engine of Defendants' NSA Scheme. In practice, the fraudulent submissions—including claims and notices of open negotiations—are transmitted through automated processes operated by AGS in coordination with SCP, which controls the Provider Defendants. The emails typically appear to originate from SCP addresses (*e.g.*, idram5@scp-health.com, idram3@scp-health.com, idram6@scp-health.com), but include footers revealing AGS's automation, such as: *"This is an auto-generated email. Please do not reply. Regards, Process Automation [uipathdev.agsX]."* The bracketed username varies, suggesting the use of multiple distinct AGS-controlled bots operating under SCP's email domain. While AGS's bots handle the actual submission process and interactions with the IDR Portal, the attached documentation—such as attestations and cover letters—are purportedly signed in the name of SCP employees on behalf of the Provider Defendants (*e.g.*, Rebecca "Becky" Bug – Managed Care Assistant; Paul Jordan – Director of Revenue Assurance), whether by automated or

---

[42] *See* AGS Health, *Leveraging Automation to Manage the No Surprises Act Dispute Process* (Dec. 7, 2023), https://www.agshealth.com/blog/leveraging-automation-to-manage-the-no-surprises-act-dispute-process/ (emphasis added).
[43] *Id.*

manual means. This demonstrates that AGS is directly integrated into SCP's systems, submitting claims through concealed automation under SCP's name.

158.    In sum, the relationship between AGS, SCP, and the Provider Defendants was not passive. Together, they coordinated to pursue the common purpose of exploiting the IDR process by maximizing the number of disputes submitted and inflating payment demands well beyond commercially reasonable rates. The use of AGS and its bots as a submission engine was not incidental or isolated; it was a deliberate component of the SCP Enterprise's strategy to bypass the limitations of individual-provider capacity, automate the submission of disputes at scale, and conceal the ineligibility or inflation embedded in each claim. And although AGS advertises the power of its automation tools and bots to manage the IDR process, it requires a key element that can only be provided by SCP and the Provider Defendants—out-of-network patient services that can be billed to health care plans and subsequently submitted to the IDR process. The goal of the NSA scheme was to fraudulently obtain payments for out-of-network services from payors like Anthem to which they were not entitled by law.

## IV.    The SCP Enterprise Exploits the IDR Process at the Expense of Anthem.

159.    During the relevant time period, the SCP Enterprise transmitted or caused to be transmitted by wire communication or radio communication in interstate commerce, writings, signs, signals, pictures, and sounds, including false and fraudulent statements, representations, and attestations related to IDR disputes, from and between the state in which they operate—at a minimum, Virginia, Louisiana, and Washington, D.C.—to Certified Independent Dispute Resolution Entities located in various states, including, for example, Pennsylvania, New York, and Maryland, in furtherance of the fraudulent scheme.

160.     Defendants made false and fraudulent statements, representations, and attestations related to the following illustrative fraudulent IDR disputes, including but not limited to the following:

### A.     Ingleside Emergency Group

### *DISP-1328085 (Ineligible State Law Claim)*

161.     The IDR proceeding captioned DISP-1328085 involved a service that Ingleside rendered on December 27, 2023, to a member of a health plan administered by Healthkeepers. Ingleside billed $2,089 for this service using the CPT code 99285. As a fully-insured plan, the member's plan is subject to state law, and therefore, the Virginia Balance Billing Law—rather than the NSA—governed the $238 reimbursement rate, as depicted on the original remittance advice below, for the services. Further, because it was not within the NSA's scope, no QPA applied to this service.

162.     When Healthkeepers issued payment on or about February 21, 2024, the remittance advice sent to Ingleside reflected that the claim was processed pursuant to explanation code "ARS":

| SERVICE DATE(S) | SERVICE CODES | POS | CHARGE | ALLOWED | DEDUCTIBLE | CO-PAY | CO-INSURANCE | CONTRACTUAL DIFFERENCE | PROVIDER RESP. AMOUNT | EXPL/ANSI CODE(S) | INSURED RESPONSIBILITY AMOUNT | EXPL/ANSI CODE(S) | WHAT WE WILL PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSURED'S NAME: ▓ | | | | INSURED'S ID: ▓ | | | | | PATIENT NAME: ▓ | | | | FOR INQUIRIES CALL: |
| PATIENT ACCOUNT#: | | | | CLAIM NUMBER: 2024047DD4579 | | | | | RECEIVED DATE: 02/16/2024 | | | | (855) 856-9286 |
| SERVICE PROVIDER NAME: INGLESIDE EMERGENCY GROUP | | | | SERVICE PROVIDER ID: XXXXX9503 | | | | | EXPL CD: | | | | |
| NETWORK: OUT OF NETWORK | | | | RELATIONSHIP TO INSURED: FEMALE SUBSCRIBER | | | | PLAN TYPE: HMO | DRG RCVD: N/A | | | | |
| 12/27/2023 12/27/2023 | 99285 | 23 | 2,089.00 | 238.00 | 0.00 | 0.00 | 0.00 | 1,851.00 | 1,851.00 | ARS 45 | 0.00 | | 238.00 |
| | TOTAL: | | 2,089.00 | 238.00 | 0.00 | 0.00 | 0.00 | 1,851.00 | 1,851.00 | | 0.00 | | 238.00 |
| INTEREST | | | | | | | | | | | | | 0.00 |

163.     The description of this code, printed at the end of the remittance advice and as reflected below, was: "Following Virginia Balance Billing Laws and rules, we paid the doctor/facility based on the member's benefits when they receive care in their plan's network. The member is only responsible for their copay, percentage of cost (coinsurance), and deductible. The doctor/facility can't bill the member for more."

| ARS | This was adjusted to follow Virginia balance billing laws and rules. Payment reflects the amount paid based on the member's benefits when they receive care from a doctor/facility in their plan's network. If you disagree with our decision and have documents to support the claim, from Availity.com select the Claims & Payments tab to access Claims Status. Find the claim and select the Dispute button. As a reminder, the member is not responsible for the amount due. |
| --- | --- |

164.    The remittance advice was addressed to Ingleside at the following address: PO Box 731587, Dallas, Texas 75373-1587 (the "Dallas PO Box"). Upon information and belief, the Dallas PO Box is associated and or affiliated with SCP.

165.    On May 11, 2024, SCP initiated IDR on behalf of Ingleside. SCP did so in coordination with AGS, and listed the email address, idram6@scp-health.com—upon information and belief, one of AGS's AI bots—as well as the Lafayette Address (SCP's Headquarters), on the Notice of IDR Initiation. SCP, on behalf of Ingleside and in coordination with AGS, falsely attested that the service was a qualified item or service within the scope of the federal IDR process.  The IDR initiation form was signed by Breon Terrance.

166.    On or about August 5, 2024, Healthkeepers submitted an objection to eligibility, which was also addressed to Ingleside at SCP's Dallas PO Box, stating, in relevant part: "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." Despite this explicit notice of ineligibility, neither Ingleside nor SCP withdrew the dispute, and AGS continued to press the claim.

167.    As a result of these fraudulent attestations, upon which Healthkeepers justifiably relied, Healthkeepers paid $1,091 for the ineligible services—approximately 5 times the state-mandated amount for the service—along with $765 in unnecessary IDR-related fees.

### DISP-2771681 (Ineligible State Law Claim)

168.    The IDR proceeding captioned DISP-2771681 involved a service that Ingleside rendered on October 24, 2024, to a member of a health plan administered by Anthem BCBS.

Ingleside billed $2,194 for this service using the CPT code 99285. As a fully-insured plan, the member's plan is subject to state law and, therefore, the Virginia Balance Billing Law—rather than the NSA—governed the $267.60 reimbursement rate, as depicted on the original remittance advice below, for this service. Further, because it was not within the NSA's scope, no QPA applied to this service.

169.    When Anthem BCBS issued payment on or about December 18, 2024, to Ingleside at the Dallas PO Box, the remittance advice sent to Ingleside reflected that the claim was processed pursuant to explanation code "ARS":

| SERVICE DATE(S) | SERVICE CODES | POS | CHARGE | ALLOWED | DEDUCTIBLE | CO-PAY | CO-INSURANCE | CONTRACTUAL DIFFERENCE | PROVIDER RESP. AMOUNT | EXPL/ANSI CODE(S) | INSURED RESPONSIBILITY AMOUNT | EXPL/ANSI CODE(S) | WHAT WE WILL PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSURED'S NAME: | | | | INSURED'S ID: | | | | | | PATIENT NAME: | | | FOR INQUIRIES CALL: |
| PATIENT ACCOUNT#: | | | | CLAIM NUMBER: 2024349CC8622 | | | | | | RECEIVED DATE: 12/14/2024 | | | (833) 592-9956 |
| SERVICE PROVIDER NAME: INGLESIDE EMERGENCY GROUP | | | | SERVICE PROVIDER ID: XXXXX9503 | | | | | | EXPL CD: | | | |
| NETWORK: OUT OF NETWORK | | | | RELATIONSHIP TO INSURED: SPOUSE | | | | PLAN TYPE: PPO | DRG RCVD: N/A | | | | |
| 10/24/2024 10/24/2024 | 99285 | 23 | 2,194.00 | 267.60 | 0.00 | 0.00 | 0.00 | 1,926.40 | 1,926.40 | ARS 45 | 0.00 | | 267.60 |
| | TOTAL: | | 2,194.00 | 267.60 | 0.00 | 0.00 | 0.00 | 1,926.40 | 1,926.40 | | 0.00 | | 267.60 |
| INTEREST | | | | | | | | | | | | | 0.00 |
| | TOTAL NET PAID | | | | | | | | | | | | 267.60 |

170.    The description of this code, printed at the end of the remittance advice and as reflected below, noted: "This was adjusted to follow Virginia balance billing laws and rules. Payment reflects the amount paid based on the member's benefits when they receive care from a doctor/facility in their plan's network."

| ARS | This was adjusted to follow Virginia balance billing laws and rules. Payment reflects the amount paid based on the member's benefits when they receive care from a doctor/facility in their plan's network. If you disagree with our decision and have documents to support the claim, from Availity.com select the Claims & Payments tab to access Claims Status. Find the claim and select the Dispute button. As a reminder, the member is not responsible for the amount due. |
|---|---|

171.    On January 29, 2025, even though SCP and Ingleside knew that the claim was subject to Virginia's balance billing laws and not the NSA, SCP, again, acting for Ingleside and in coordination with AGS, using the email address idram3@scphealth.com—upon information and belief, one of AGS's AI bots—sent a notice of open negotiation to Anthem BCBS to initiate the

federal IDR process. The notice of open negotiation email submission stated "This is an auto-generated email. Please do not reply," and was signed by "Process Automation, upathdev.ags2."

172.    The notice of open negotiation was signed by Paul Jordan, SCP's Director of Revenue Assurance, and indicated an email address of Paul_Jordan@scphealth.com and a mailing address of the Lafayette Address (SCP's Headquarters).

173.    On February 7, 2025, Anthem emailed its response to the notice of open negotiation to Paul Jordan at Paul_Jordan@scphealth.com, noting that the dispute did not qualify for IDR. Specifically, it stated: "After review of the attached case, these do not qualify for the Federal Surprise Bill. As required by the Federal No Surprises Act, our EOBs are clearly marked when a case qualifies for Federal NSA with EOB codes: AUU, AUS, AWL and AUQ. Please review and if you disagree, please send proof that the case qualifies for the Federal NSA before our 30-business day negotiation period ends. We will assume agreement if there is no response[.]"

174.    In addition, on or about February 18, 2025, Anthem mailed a written response to the notice of open negotiation to Ingleside, with attention to Paul Jordan (SCP), at the Lafayette Address (SCP's Headquarters). The letter reiterated that the dispute did not qualify for IDR because the claim was not governed by the NSA. Despite this explicit notice of ineligibility, neither Ingleside, SCP, nor AGS withdrew the dispute.

175.    Despite clear application of Virginia's state surprising billing law, on March 15, 2025, SCP, on behalf of Ingleside and in coordination with AGS, initiated IDR and falsely attested that the services were a qualified item or service within the scope of the federal IDR process. The email listed on the notice of initiation is scp.reimbursement@ags.com. The IDR initiation form was signed by Paul Jordan.

176. On or about April 3, 2025, Anthem submitted an objection to eligibility, which was also addressed to Ingleside at the Lafayette Address (SCP's Headquarters), stating "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." Despite this explicit notice of ineligibility, neither Ingleside nor SCP withdrew the dispute—and AGS, acting as their agent in the submission process, continued to press the claim.

177. As a result of these fraudulent attestations, upon which Anthem BCBS justifiably relied, Anthem BCBS paid $1,150 for the ineligible service—approximately four times the state-mandated amount for the service—along with $503 in unnecessary IDR-related fees.

DISP-2833360 (Ineligible State Law Claim)

178. The IDR proceeding captioned DISP-2833360 involved a service that Ingleside rendered on December 3, 2024, to a member of a health plan administered by Healthkeepers. Ingleside billed $2,825 for this service using the CPT code 99291. As a fully-insured plan, the member's plan is subject to state law and, therefore, the Virginia Balance Billing Law—rather than the NSA—governed the $256.55 reimbursement rate, as depicted on the original remittance advice below, for the services. Further, because it was not within the NSA's scope, no QPA applied to this service.

179. When Healthkeepers issued payment on or about December 26, 2024, to the Dallas PO Box, the remittance advice sent to Ingleside reflected that the claim was processed pursuant to explanation code "ARS":

| SERVICE DATE(S) | SERVICE CODES | POS | CHARGE | ALLOWED | DEDUCTIBLE | CO-PAY | CO-INSURANCE | CONTRACTUAL DIFFERENCE | PROVIDER RESP. AMOUNT | EXPL/ANSI CODE(S) | INSURED RESPONSIBILITY AMOUNT | EXPL/ANSI CODE(S) | WHAT WE WILL PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSURED'S NAME: PATIENT ACCOUNT #: SERVICE PROVIDER NAME: INGLESIDE EMERGENCY GROUP NETWORK: OUT OF NETWORK | | | INSURED'S ID: CLAIM NUMBER: 2024352DT6574 SERVICE PROVIDER ID: XXXXX9503 RELATIONSHIP TO INSURED: FEMALE SUBSCRIBER | | | | | | PATIENT NAME: RECEIVED DATE: 12/17/2024 EXPL CD: PLAN TYPE: HMO    DRG RCVD: N/A | | | FOR INQUIRIES CALL: (855) 856-9286 | | |
| 12/03/2024 12/03/2024 | 99291 | 23 | 2,825.00 | 256.55 | 0.00 | 0.00 | 0.00 | 2,568.45 | 2,568.45 | ARS 45 | 0.00 | | 256.55 |
| | TOTAL: | | 2,825.00 | 256.55 | 0.00 | 0.00 | 0.00 | 2,568.45 | 2,568.45 | | 0.00 | | 256.55 |
| INTEREST | | | | | | | | | | | | | 0.00 |
| | TOTAL NET PAID | | | | | | | | | | | | 256.55 |

180. The description of this code, printed at the end of the remittance advice and as reflected below, noted, in relevant part: "This was adjusted to follow Virginia balance billing laws

and rules. Payment reflects the amount paid based on the member's benefits when they receive care from a doctor/facility in their plan's network."

> ARS
>
> This was adjusted to follow Virginia balance billing laws and rules. Payment reflects the amount paid based on the member's benefits when they receive care from a doctor/facility in their plan's network. If you disagree with our decision and have documents to support the claim, from Availity.com select the Claims & Payments tab to access Claims Status. Find the claim and select the Dispute button. As a reminder, the member is not responsible for the amount due.

181. On February 5, 2025, even though SCP and Ingleside knew that the claim was subject to Virginia's balance billing laws and not the NSA, SCP, again, acting for Ingleside and in coordination with AGS, using the email address IDRAM3@scphealth.com—upon information and belief, one of AGS's AI bots—sent a notice of open negotiation to Healthkeepers to initiate the federal IDR process. The notice of open negotiation email submission stated "This is an auto-generated email. Please do not reply," and was signed by "Process Automation, upathdev.ags2."

182. The notice of open negotiation was signed by Paul Jordan (SCP) and indicated an email address of Paul_Jordan@scp.health.com and a mailing address at the Lafayette Address (SCP's Headquarters).

183. On or about February 6, 2025, Healthkeepers addressed its response to the notice of open negotiation to Paul Jordan (SCP) at the Lafayette Address (SCP's Headquarters). The letter stated that the dispute did not qualify for IDR because the claim was not governed by the NSA. Neither Ingleside, SCP, nor AGS responded to this assertion of ineligibility.

184. Despite clear application of Virginia's balance billing laws, on March 24, 2025, SCP, on behalf of Ingleside and in coordination with AGS, initiated IDR and falsely attested that the services were a qualified item or service within the scope of the federal IDR process. The email listed on the Notice of IDR initiation is idram5@scp-health.com. The IDR initiation form was signed by Angelina Variet.

185. On or about April 10, 2025, Healthkeepers submitted an objection to eligibility, which was also addressed to Ingleside at the Lafayette Address (SCP's Headquarters), stating "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." Despite this explicit notice of ineligibility, neither Ingleside nor SCP withdrew the dispute—and AGS, acting as their agent in the submission process, continued to press the claim.

186. As a result of these fraudulent attestations, upon which Healthkeepers justifiably relied, Healthkeepers paid $1,406 for the ineligible service—approximately five and a half times the state-mandated amount for the service—along with $503 in unnecessary IDR-related fees.

### B. Kingsford Emergency Group

### *DISP-1562249 (Ineligible State Law Claim)*

187. The IDR proceeding captioned DISP-1562249 involved a service that Kingsford rendered on December 30, 2023, to a member of a health plan administered by Healthkeepers. Kingsford billed $2,089 for the service using the CPT code 99285. As a fully-insured plan, the member's plan is subject to state law and, therefore, the Virginia Balance Billing Law—rather than the NSA—governed the $256.06 reimbursement rate, as depicted on the original remittance advice below, for the services. Further, because it was not within the NSA's scope, no QPA applied to this service.

188. When Healthkeepers issued payment on or about February 28, 2024, the remittance advice sent to Kingsford at the Dallas PO Box reflected that the claim was processed pursuant to explanation code "ARS":

| SERVICE DATE(S) | SERVICE CODES | POS | CHARGE | ALLOWED | DEDUCTIBLE | CO-PAY | CO-INSURANCE | CONTRACTUAL DIFFERENCE | PROVIDER RESP. AMOUNT | EXPL/ANSI CODE(S) | RESPONSIBILITY AMOUNT | EXPL/ANSI CODE(S) | WHAT WE WILL PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSURED'S NAME: | | | | INSURED'S ID: | | | | | PATIENT NAME: | | | FOR INQUIRIES CALL: |  |
| PATIENT ACCOUNT#: | | | | CLAIM NUMBER: | 2024050DR7760 | | | | RECEIVED DATE: | 02/19/2024 | | (855) 856-9286 | |
| SERVICE PROVIDER NAME: KINGSFORD EMERGENCY GROUP | | | | SERVICE PROVIDER ID: | XXXXX9268 | | | | EXPL CD: | | | | |
| NETWORK: OUT OF NETWORK | | | | RELATIONSHIP TO INSURED: | FEMALE SUBSCRIBER | | | PLAN TYPE: HMO | DRG RCVD: N/A | | | | |
| 12/30/2023 12/30/2023 | 99285 | 23 | 2,089.00 | 256.06 | 0.00 | 0.00 | 102.42 | 1,832.94 | 1,832.94 | ARS 45 | 102.42 | 067 2 | 153.64 |
| | TOTAL: | | 2,089.00 | 256.06 | 0.00 | 0.00 | 102.42 | 1,832.94 | 1,832.94 | | 102.42 | | 153.64 |
| INTEREST | | | | | | | | | | | | | 0.00 |
| | TOTAL NET PAID | | | | | | | | | | | | 153.64 |

189.     The description of this code, printed at the end of the remittance advice and as reflected below, was: "Following Virginia Balance Billing Laws and Rules, we paid the doctor/facility based on the member's benefits when they receive care in their plan's network. The member is only responsible for their copay, percentage of the cost (coinsurance), and deductible. The doctor/facility can't bill the member for more."

```
ARS          FOLLOWING VIRGINIA BALANCE BILLING LAWS AND RULES, WE PAID THE DOCTOR/FACILITY BASED
             ON THE MEMBER'S BENEFITS WHEN THEY RECEIVE CARE IN THEIR PLAN'S NETWORK. THE MEMBER
             IS ONLY RESPONSIBLE FOR THEIR COPAY, PERCENTAGE OF THE COST (COINSURANCE), AND
             DEDUCTIBLE. THE DOCTOR/FACILITY CAN'T BILL THE MEMBER FOR MORE.
```

190.     On April 3, 2024, even though SCP and Kingford knew that the claim was subject to Virginia's balance billing laws and not the NSA, SCP, again, acting for Kingsford and in coordination with AGS, using the email address IDRAM@scphealth.com—upon information and belief, one of AGS's AI bots—sent a notice of open negotiation to Healthkeepers to initiate the federal IDR process. The open negotiation notice enclosed multiple spreadsheets for various providers purporting to "negotiate" fifty-nine services from Kingsford and more than 1,500 services for twenty-one other providers from different states. Again, this tactic of purportedly opening negotiations for more than fifteen-hundred services across multiple providers and states all at once is part of Defendants' strategy to overwhelm health plans and the IDR process.

| | |
|---|---|
| From: | IDRAM |
| Sent: | Wednesday, April 3, 2024 6:29 PM |
| To: | FederalIDRIntake |
| Cc: | scp.negotiations |
| Subject: | {EXTERNAL} Notice of Open Negotiation zsecure |
| Attachments: | Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-WAYNE EMERGENCY GROUP LLC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-ALLATOONA EMERGENCY GROUP PC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-ALLATOONA EMERGENCY GROUP PC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-BALDWIN EMERGENCY GROUP LLC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-BALDWIN EMERGENCY GROUP LLC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-COFFEE EMERGENCY GROUP LLC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-COFFEE EMERGENCY GROUP LLC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-COWETA EMERGENCY GROUP LLC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-COWETA EMERGENCY GROUP LLC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-EMERGENCY PHYSICIANS OF FORSYTH PC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-EMERGENCY PHYSICIANS OF FORSYTH PC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-HIGHTOWER EMERGENCY GROUP PC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-HIGHTOWER EMERGENCY GROUP PC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-MADISON EMERGENCY GROUP PC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-MADISON EMERGENCY GROUP PC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-MONTGOMERY EMERGENCY GROUP LLC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-MONTGOMERY EMERGENCY GROUP LLC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-PEACH EMERGENCY GROUP LLC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-PEACH EMERGENCY GROUP LLC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-REID EMERGENCY GROUP PC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-REID EMERGENCY GROUP PC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-UNITED EMERGENCY SERVICES INC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-UNITED EMERGENCY SERVICES INC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-WALKER LAKE EMERGENCY GROUP PC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-WALKER LAKE EMERGENCY GROUP PC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-GA-WAYNE EMERGENCY GROUP LLC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-MO-RIPLEY EMERGENCY GROUP LLC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-MO-SIKESTON EMERGENCY GROUP LLC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-MO-SIKESTON EMERGENCY GROUP LLC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-MO-RIPLEY EMERGENCY GROUP LLC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-VA-WESTERN VIRGINIA REG EMERG PHYS LLC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-VA-WILDWOOD EMERGENCY GROUP LLC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-VA-WILDWOOD EMERGENCY GROUP LLC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-VA-INGLESIDE EMERGENCY GROUP LLC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-VA-INGLESIDE EMERGENCY GROUP LLC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-VA-KINGSFORD EMERGENCY GROUP LLC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-VA-KINGSFORD EMERGENCY GROUP LLC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-VA-LAKE SPRING EMERGENCY GROUP LLC 04_03_2024.pdf; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-VA-LAKE SPRING EMERGENCY GROUP LLC 04_03_2024.xlsx; Arbitration Prod Wed Breakout BLUE CROSS BLUE SHIELD-VA-WESTERN VIRGINIA REG EMERG PHYS LLC 04_03_2024.pdf |

IDRAM



**SCP HEALTH**

200 Corporate Boulevard | Lafayette, Louisiana 70508
P 337.609.2720 | F 337.262.4341
IDRAM@scphealth.com
SCP-Health.com

191. Despite clear application of Virginia's balance billing laws, on July 20, 2024, SCP, on behalf of Kingsford and in coordination with AGS, listing the email address scp.reimbursement@agshealth.com on the Notice of IDR Initiation, initiated IDR and falsely attested that the services were a qualified item or service within the scope of the federal IDR process. The IDR initiation form was signed by Paul Jordan.

192.    Healthkeepers submitted an objection to eligibility on or about December 20, 2024, which was also addressed to Kingsford at SCP's Dallas PO Box, stating, in relevant part: "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." Despite this explicit notice of ineligibility, neither Kingsford nor SCP withdrew the dispute—and AGS, acting as their agent in the submission process, continued to press the claim.

193.    As a result of these fraudulent attestations, upon which Healthkeepers justifiably relied, Healthkeepers paid $998.58 for the ineligible service—nearly four times the state-mandated amount for the service—along with $512 in unnecessary IDR-related fees.

### *DISP-603186 (Ineligible State Law Claim)*

194.    The IDR proceeding captioned DISP-603186 involved a service that Kingsford rendered on April 30, 2023, to a member of a fully-insured health plan administered by Healthkeepers. Kingsford billed $2,089 for the service using the CPT code 99285. As a fully-insured plan, the member's plan is subject to state law and, therefore, Virginia's balance billing laws—rather than the NSA—governed the $256.06 reimbursement rate, as depicted on the original remittance advice below, for the services. Further, because it was not within the NSA's scope, no QPA applied to this service.

195.    When Healthkeepers issued payment on June 28, 2023, the remittance advice sent to Kingsford at the Dallas PO Box reflected that the claim was processed pursuant to explanation code "ARS":

| SERVICE DATE(S) | SERVICE CODES | POS | CHARGE | ALLOWED | DEDUCTIBLE | CO-PAY | CO-INSURANCE | CONTRACTUAL DIFFERENCE | PROVIDER RESP. AMOUNT | EXPL/ANSI CODE(S) | INSURED RESPONSIBILITY AMOUNT | EXPL/ANSI CODE(S) | WHAT WE WILL PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSURED'S NAME: | | | | INSURED'S ID: | | | | | | PATIENT NAME: | | | FOR INQUIRIES CALL: |
| PATIENT ACCOUNT#: | | | | CLAIM NUMBER: | | | | | | RECEIVED DATE: | 06/20/2023 | | (855) 856-9286 |
| SERVICE PROVIDER NAME: KINGSFORD EMERGENCY GROUP | | | | SERVICE PROVIDER ID: XXXXX9268 | | | | | | EXPL CD: | | | |
| NETWORK: OUT OF NETWORK | | | | RELATIONSHIP TO INSURED: | | | | PLAN TYPE: HMO | DRG RCVD: N/A | | | | |
| 04/30/2023 04/30/2023 | 99285 | 23 | 2,089.00 | 256.06 | 256.06 | 0.00 | 0.00 | 1,832.94 | 1,832.94 | ARS 45 | 256.06 | 038 1 | 0.00 |
| | TOTAL: | | 2,089.00 | 256.06 | 256.06 | 0.00 | 0.00 | 1,832.94 | 1,832.94 | | 256.06 | | 0.00 |
| INTEREST | | | | | | | | | | | | | 0.00 |
| | TOTAL NET PAID | | | | | | | | | | | | 0.00 |

196.    The description of this code, printed at the end of the remittance advice and as reflected below, was: "Following Virginia Balance Billing Laws and Rules, we paid the

doctor/facility based on the member's benefits when they receive care in their plan's network. The member is only responsible for their copay, percentage of cost (coinsurance), and deductible. The doctor/facility can't bill the member for more."

```
ARS          FOLLOWING VIRGINIA BALANCE BILLING LAWS AND RULES, WE PAID THE DOCTOR/FACILITY BASED
             ON THE MEMBER'S BENEFITS WHEN THEY RECEIVE CARE IN THEIR PLAN'S NETWORK. THE MEMBER
             IS ONLY RESPONSIBLE FOR THEIR COPAY, PERCENTAGE OF THE COST (COINSURANCE), AND
             DEDUCTIBLE. THE DOCTOR/FACILITY CAN'T BILL THE MEMBER FOR MORE.
```

197.    Despite clear application of Virginia's balance billing laws, on October 16, 2023, SCP, on behalf of Kingsford and in coordination with AGS, initiated IDR and falsely attested that the services were a qualified item or service within the scope of the federal IDR process. The email address listed on the Notice of IDR initiation was scp.reimbursement@agshealth.com.  The IDR initiation form was signed by Paul Jordan.

198.    On October 15, 2024, and in coordination with a timely submission of an offer to the IDRE, Healthkeepers submitted an objection to eligibility, which was also addressed to Kingsford at the Dallas PO Box, stating, in relevant part: "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." Despite this explicit notice of ineligibility, neither Kingsford nor SCP withdrew the dispute—and AGS, acting as their agent in the submission process, continued to press the claim.

199.    As a result of Kingsford and SCP's fraudulent attestations, upon which Healthkeepers justifiably relied, Healthkeepers paid $834.94 for the ineligible service— approximately three times the state-mandated amount for the service—along with $445 in unnecessary IDR-related fees.

### *DISP-625836 (Ineligible State Law Claim)*

200.    The IDR proceeding captioned DISP-625836 involved a service that Kingsford rendered on March 27, 2023, to a member of a fully-insured health plan administered by Healthkeepers. Kingsford billed $2,089 using the CPT code 99285. As a fully-insured plan, the

member's plan is subject to state law and, therefore, Virginia's balance billing laws—rather than the NSA—governed the $256.06 reimbursement rate, as depicted on the original remittance advice below, for the service. Further, because it was not within the NSA's scope, no QPA applied to this service.

201. When Healthkeepers issued payment, the remittance advice on May 24, 2023 sent to Kingsford at the Dallas PO Box reflected that the claim was processed pursuant to the explanation code "ARS":

| SERVICE DATE(S) | SERVICE CODES | POS | CHARGE | ALLOWED | DEDUCTIBLE | CO-PAY | CO-INSURANCE | CONTRACTUAL DIFFERENCE | PROVIDER RESP. AMOUNT | EXPL/ANSI CODE(S) | INSURED RESPONSIBILITY AMOUNT | EXPL/ANSI CODE(S) | WHAT WE WILL PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSURED'S NAME: | | | | INSURED'S ID: | | | | | PATIENT NAME: | | | | FOR INQUIRIES CALL: |
| PATIENT ACCOUNT#: | | | | CLAIM NUMBER: | | | | | RECEIVED DATE: | 05/17/2023 | | | (855) 856-9286 |
| SERVICE PROVIDER NAME: KINGSFORD EMERGENCY GROUP | | | | SERVICE PROVIDER ID: XXXXX9268 | | | | | EXPL CD: | | | | |
| NETWORK: OUT OF NETWORK | | | | RELATIONSHIP TO INSURED: | | | PLAN TYPE: HMO | | DRG RCVD: N/A | | | | |
| 03/27/2023 03/27/2023 | 99285 | 23 | 2,089.00 | 256.06 | 0.00 | 0.00 | 0.00 | 1,832.94 | 1,832.94 | ARS 45 | 0.00 | | 256.06 |
| | TOTAL: | | 2,089.00 | 256.06 | 0.00 | 0.00 | 0.00 | 1,832.94 | 1,832.94 | | 0.00 | | 256.06 |
| INTEREST | | | | | | | | | | | | | 0.00 |
| | TOTAL NET PAID | | | | | | | | | | | | 256.06 |

202. The description of this code printed at the end of the remittance advice and as reflected below, was: "[f]ollowing Virginia's Balance Billing Laws and rules, we paid the doctor/facility based on the member's benefits when they receive care in their plan's network. The member is only responsible for their copay, percentage of the cost (coinsurance), and deductible. The doctor/facility can't bill the member for more."

ARS     FOLLOWING VIRGINIA BALANCE BILLING LAWS AND RULES, WE PAID THE DOCTOR/FACILITY BASED ON THE MEMBER'S BENEFITS WHEN THEY RECEIVE CARE IN THEIR PLAN'S NETWORK. THE MEMBER IS ONLY RESPONSIBLE FOR THEIR COPAY, PERCENTAGE OF THE COST (COINSURANCE), AND DEDUCTIBLE. THE DOCTOR/FACILITY CAN'T BILL THE MEMBER FOR MORE.

203. Despite clear application of Virginia's balance billing laws, on October 19, 2023, SCP, on behalf of Kingsford and in coordination with AGS, initiated IDR and falsely attested that the services were a qualified item or service within the scope of the federal IDR process. The email listed on the notice of IDR initiation was idram6@scp-health.com—upon information and belief, one of AGS's AI bots—on the Notice of IDR Initiation. The IDR initiation form was signed by Breon Terrance.

204. On September 19, 2024, in coordination with the submission of a timely offer to the IDRE, Healthkeepers submitted an objection to eligibility, which was also addressed to Kingsford at the Dallas PO Box, stating, in relevant part: "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." Despite this explicit notice of ineligibility, neither Kingsford nor SCP withdrew the dispute—and AGS, acting as their agent in the submission process, continued to press the claim.

205. In January 2024, as a result of AGS and Kingsford's fraudulent attestations, upon which Healthkeepers justifiably relied, Healthkeepers paid $1,091 for the ineligible service—approximately four times the state-mandated payment amount for this service—along with $445 in unnecessary IDR-related fees.

   C.   **Lake Spring Emergency Group**

***DISP-757279 (Ineligible State Law Claim)***

206. The IDR proceeding captioned DISP-757279 involved a service that Lake Spring rendered on July 1, 2023, to a member of a fully-insured health plan administered by Anthem BCBS. Lake Spring billed $2,089 for the service using the CPT code 99285. As a fully-insured plan, the member's plan is subject to state law and, therefore, Virginia's balance billing laws—rather than the NSA—governed the $263.76 reimbursement rate, as depicted on the original remittance advice below, for the services. Further, because it was not within the NSA's scope, no QPA applied to this service.

207. When Anthem BCBS issued payment on August 30, 2023, the remittance advice sent to Lake Spring at the Dallas PO Box reflected that the claim was processed pursuant to explanation code "ARS":

| SERVICE DATE(S) | SERVICE CODES | POS | CHARGE | ALLOWED | DEDUCTIBLE | CO-PAY | CO-INSURANCE | CONTRACTUAL PROVIDER RESP. DIFFERENCE | PROVIDER RESP. AMOUNT | EXPL/ANSI CODE(S) | INSURED RESPONSIBILITY AMOUNT | EXPL/ANSI CODE(S) | WHAT WE WILL PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSURED'S NAME: ███ PATIENT ACCOUNT#: ███ SERVICE PROVIDER NAME: LAKE SPRING EMERGENCY GRO NETWORK: OUT OF NETWORK | | | INSURED'S ID: ███ CLAIM NUMBER: ███ SERVICE PROVIDER ID: XXXXX3619 RELATIONSHIP TO INSURED: ███ | | | | | PLAN TYPE: PPO | | PATIENT NAME: ███ RECEIVED DATE: 08/21/2023 EXPL CD: DRG RCVD: N/A | | FOR INQUIRIES CALL: (855) 856-9286 | |
| 07/01/2023 07/01/2023 | 99285 | 23 | 2,089.00 | 263.76 | 0.00 | 0.00 | 52.75 | 1,825.24 | 1,825.24 | ARS 45 | 52.75 | 067 2 | 211.01 |
| 07/01/2023 07/01/2023 | 12013 | 23 | 709.00 | 71.99 | 0.00 | 0.00 | 14.40 | 637.01 | 637.01 | ARS 45 | 14.40 | 067 2 | 57.59 |
| | TOTAL: | | 2,798.00 | 335.75 | 0.00 | 0.00 | 67.15 | 2,462.25 | 2,462.25 | | 67.15 | | 268.60 |
| INTEREST | | | | | | | | | | | | | 0.00 |
| | TOTAL NET PAID | | | | | | | | | | | | 268.60 |

208.   The description of this code, printed at the end of the remittance advice and as reflected below, was: "Following Virginia Balance Billing Laws and Rules, we paid the doctor/facility based on the member's benefits when they receive care in their plan's network. The member is only responsible for their copay, percentage of cost (coinsurance), and deductible. The doctor/facility can't bill the member for more."

ARS          FOLLOWING VIRGINIA BALANCE BILLING LAWS AND RULES, WE PAID THE DOCTOR/FACILITY BASED ON THE MEMBER'S BENEFITS WHEN THEY RECEIVE CARE IN THEIR PLAN'S NETWORK. THE MEMBER IS ONLY RESPONSIBLE FOR THEIR COPAY, PERCENTAGE OF THE COST (COINSURANCE), AND

209.   Despite clear application of Virginia's balance billing laws, on November 18, 2023, SCP, on behalf of Lake Spring and in coordination with AGS, initiated IDR and falsely attested that the services were a qualified item or service within the scope of the federal IDR process. The email listed on the Notice of IDR initiation was scp.reimbursement@agshealth.com.  The IDR initiation form was signed by Paul Jordan.

210.   On October 15, 2024, in coordination with the timely submission of an offer to the IDRE, Anthem BCBS submitted an objection to eligibility, which was also addressed to Lake Spring at the Dallas PO Box, stating, in relevant part: "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." Despite this explicit notice of ineligibility, neither Lake Spring nor SCP withdrew the dispute—and AGS, acting as their agent in the submission process, continued to press the claim.

211.   As a result of SCP and Lake Spring's fraudulent attestations, upon which Anthem BCBS justifiably relied, Anthem BCBS paid $1,038.25 for the ineligible service—approximately

four times the state-mandated amount for the service—along with $415 in unnecessary IDR-related fees.

### DISP-753247 (Ineligible State Law Claim)

212.   The IDR proceeding captioned DISP-753247 involved a service that Lake Spring rendered on June 23, 2023, to a member of a fully-insured health plan administered by Healthkeepers. Lake Spring billed $2,089 for the service using the CPT code 99285. As a fully-insured plan, the member's plan is subject to state law, and therefore, Virginia's balance billing laws—rather than the NSA—governed the $256.06 reimbursement rate, as depicted on the original remittance advice below, for the services. Further, because it was not within the NSA's scope, no QPA applied to this service.

213.   When Healthkeepers issued payment on August 23, 2023, the remittance advice sent to Lake Spring at the Dallas PO Box reflected that the claim was processed pursuant to explanation code "ARS":

| SERVICE DATE(S) | SERVICE CODES | POS | CHARGE | ALLOWED | DEDUCTIBLE | CO-PAY | CO-INSURANCE | CONTRACTUAL DIFFERENCE | PROVIDER RESP. AMOUNT | EXPL/ANSI CODE(S) | RESPONSIBILITY AMOUNT | EXPL/ANSI CODE(S) | WHAT WE WILL PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSURED'S NAME: PATIENT ACCOUNT#: SERVICE PROVIDER NAME: LAKE SPRING EMERGENCY GRO NETWORK: OUT OF NETWORK | | | | INSURED'S ID: CLAIM NUMBER: SERVICE PROVIDER ID: XXXXX3619 RELATIONSHIP TO INSURED: MALE SUBSCRIBER | | | | | PATIENT NAME: RECEIVED DATE: EXPL CD: PLAN TYPE: HMO DRG RCVD: N/A | 08/14/2023 | | | FOR INQUIRIES CALL: (855) 856-9286 |
| 06/23/2023 06/23/2023 | 99285 | 23 | 2,089.00 | 256.06 | 256.06 | 0.00 | 0.00 | 1,832.94 | 1,832.94 | ARS 45 | 256.06 | 038 1 | 0.00 |
| | TOTAL: | | 2,089.00 | 256.06 | 256.06 | 0.00 | 0.00 | 1,832.94 | 1,832.94 | | 256.06 | | 0.00 |
| INTEREST | | | | | | | | | | | | | 0.00 |
| | TOTAL NET PAID | | | | | | | | | | | | 0.00 |

214.   The description of this code, printed at the end of the remittance advice and as reflected below, was: "[f]ollowing Virginia Balance Billing Laws and rules, we paid the doctor/facility based on the member's benefits when they receive care in their plan's network. The member is only responsible for their copay, percentage of cost (coinsurance), and deductible. The doctor/facility can't bill the member for more."

ARS          FOLLOWING VIRGINIA BALANCE BILLING LAWS AND RULES, WE PAID THE DOCTOR/FACILITY BASED ON THE MEMBER'S BENEFITS WHEN THEY RECEIVE CARE IN THEIR PLAN'S NETWORK. THE MEMBER IS ONLY RESPONSIBLE FOR THEIR COPAY, PERCENTAGE OF THE COST (COINSURANCE), AND DEDUCTIBLE. THE DOCTOR/FACILITY CAN'T BILL THE MEMBER FOR MORE.

215.     Despite clear application of Virginia's balanced billing laws, on November 17, 2023, SCP, on behalf of Lake Spring and in coordination with AGS, and listing the email address scp.reimbursement@agshealth.com on the Notice of IDR Initiation, initiated IDR and falsely attested that the services were a qualified item or service within the scope of the federal IDR process. The IDR initiation form was signed by Paul Jordan.

216.     On October 1, 2024, in coordination with the timely submission of an offer to the IDRE, Healthkeepers submitted an objection to eligibility, which was also addressed to Lake Spring at the Dallas PO Box, stating, in relevant part: "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." Despite this explicit notice of ineligibility, neither Lake Spring nor SCP withdrew the dispute—and AGS, acting as their agent in the submission process, continued to press the claim.

217.     As a result of Lake Spring and SCP's fraudulent attestations, upon which Healthkeepers justifiably relied, Healthkeepers paid $834.94 for the ineligible service— approximately three times the state-mandated payment amount for the service—along with $415 in unnecessary IDR-related fees.

### *DISP-592591 (Ineligible State Law Claim)*

218.     The IDR proceeding captioned DISP-592591 involved a service that Lake Spring rendered on March 29, 2023, to a member of a fully-insured health plan administered by Healthkeepers. Lake Spring billed $2,089 for the service using CPT code 99285. As a fully-insured plan, the member's plan is subject to state law, and therefore, the Virginia Balance Billing Law— rather than the NSA—governed the $256.06 reimbursement rate, as depicted on the original remittance advice below, for the services. Further, because it was not within the NSA's scope, no QPA applied to this service.

219. When Healthkeepers issued payment on July 19, 2023, the remittance advice sent to Lake Spring at the Dallas PO Box reflected that the claim was processed pursuant to explanation code ARS. The description of this code, printed at the end of the remittance advice and as reflected below, was: "Following Virginia Balance Billing Laws and rules, we paid the doctor/facility based on the member's benefits when they receive care in their plan's network. The member is only responsible for their copay, percentage of cost (coinsurance), and deductible. The doctor/facility can't bill the member for more."

| SERVICE DATE(S) | SERVICE CODES | POS | CHARGE | ALLOWED | DEDUCTIBLE | CO-PAY | CO-INSURANCE | CONTRACTUAL DIFFERENCE | PROVIDER RESP. AMOUNT | EXPL/ANSI CODE(S) | INSURED RESPONSIBILITY AMOUNT | EXPL/ANSI CODE(S) | WHAT WE WILL PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSURED'S NAME: | | | | INSURED'S ID: | | | | | PATIENT NAME: | | | | FOR INQUIRIES CALL: |
| PATIENT ACCOUNT#: | | | | CLAIM NUMBER: | | | | | RECEIVED DATE: | 05/19/2023 | | | (855) 856-9286 |
| SERVICE PROVIDER NAME: LAKE SPRING EMERGENCY GRO | | | | SERVICE PROVIDER ID: XXXXX3619 | | | | | EXPL CD: | | | | |
| NETWORK: OUT OF NETWORK | | | | RELATIONSHIP TO INSURED: | | | | PLAN TYPE: HMO | DRG RCVD: N/A | | | | |
| 03/29/2023 03/29/2023 | 99285 | 23 | 2,089.00 | 256.06 | 0.00 | 0.00 | 0.00 | 1,832.94 | 1,832.94 | ARS 45 | 0.00 | | 256.06 |
| | TOTAL: | | 2,089.00 | 256.06 | 0.00 | 0.00 | 0.00 | 1,832.94 | 1,832.94 | | 0.00 | | 256.06 |
| INTEREST | | | | | | | | | | | | | 1.01 |
| | TOTAL NET PAID | | | | | | | | | | | | 257.07 |

| | |
|---|---|
| ARS | FOLLOWING VIRGINIA BALANCE BILLING LAWS AND RULES, WE PAID THE DOCTOR/FACILITY BASED ON THE MEMBER'S BENEFITS WHEN THEY RECEIVE CARE IN THEIR PLAN'S NETWORK. THE MEMBER IS ONLY RESPONSIBLE FOR THEIR COPAY, PERCENTAGE OF THE COST (COINSURANCE), AND DEDUCTIBLE. THE DOCTOR/FACILITY CAN'T BILL THE MEMBER FOR MORE. |

220. Despite clear application of the Virginia Balance Billing Law, on October 14, 2023, SCP, on behalf of Lake Spring and in coordination with AGS, initiated IDR listing the email address scp.reimbursement@agshealth.com on the Notice of IDR Initiation, and falsely attested that the services were a qualified item or service within the scope of the federal IDR process. The IDR initiation form was signed by Paul Jordan.

221. On September 24, 2024, Healthkeepers submitted an objection to eligibility, which was also addressed to Lake Spring at the Dallas PO Box, stating, in relevant part: "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." Despite this explicit notice of ineligibility, neither Lake Spring nor SCP withdrew the dispute—and AGS, acting as their agent in the submission process, continued to press the claim.

222.    As a result of these fraudulent attestations, upon which Healthkeepers justifiably relied, Healthkeepers paid $1,091 for the ineligible service—approximately five times the state-mandated payment amount for the service—along with $445 in unnecessary IDR-related fees.

### D.    Western Virginia Regional Emergency Physicians

***DISP-233272 (Ineligible State Law Claim)***

223.    The IDR proceeding captioned DISP-233272 involved a service that Regional rendered on October 5, 2022, to a member of a fully-insured health plan administered by Healthkeepers. Regional billed $2,690 for this service using the CPT code 99291. As a fully-insured plan, the member's plan is subject to state law and, therefore, the Virginia Balance Billing Law—rather than the NSA—governed the $255.89 reimbursement rate, as depicted on the original remittance advice below, for the services. Further, because it was not within the NSA's scope, no QPA applied to this service.

224.    When Healthkeepers issued payment on November 30, 2022, a remittance advice sent to Regional at the Dallas PO Box and shown below reflected that the claim was processed pursuant to explanation code ARS. The description of this code, printed at the end of the remittance advice, noted: "Following Virginia Balance Billing laws and rules, we paid the doctor/facility based on the member's benefits when they receive care in their plan's network. The member is only responsible for their copay, percentage of the cost (coinsurance), and deductible. The doctor/facility cannot bill the member for more."

| SERVICE DATE(S) | SERVICE CODES | POS | CHARGE | ALLOWED | DEDUCTIBLE | CO-PAY | CO-INSURANCE | CONTRACTUAL DIFFERENCE | PROVIDER RESP. AMOUNT | EXPL/ANSI CODE(S) | INSURED RESPONSIBILITY AMOUNT | EXPL/ANSI CODE(S) | WHAT WE WILL PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSURED'S NAME: ▮ | | | INSURED'S ID: ▮ | | | | | PATIENT NAME: ▮ | | | FOR INQUIRIES CALL: | | |
| PATIENT ACCOUNT#: ▮ | | | CLAIM NUMBER: ▮ | | | | | RECEIVED DATE: 11/25/2022 | | | (855) 856-9286 | | |
| SERVICE PROVIDER NAME: WESTERN VIRGINIA REGIONAL | | | SERVICE PROVIDER ID: XXXXX1323 | | | | | EXPL CD: | | | | | |
| NETWORK: OUT OF NETWORK | | | RELATIONSHIP TO INSURED: ▮ | | | | PLAN TYPE: HMO | DRG RCVD: N/A | | | | | |
| 10/05/2022 10/05/2022 | 99291 | 23 | 2,690.00 | 255.89 | 0.00 | 0.00 | 0.00 | 2,434.11 | 2,434.11 | ARS 45 | 0.00 | | 255.89 |
| | TOTAL: | | 2,690.00 | 255.89 | 0.00 | 0.00 | 0.00 | 2,434.11 | 2,434.11 | | 0.00 | | 255.89 |
| INTEREST | | | | | | | | | | | | | 0.00 |
| | TOTAL NET PAID | | | | | | | | | | | | 255.89 |

ARS    FOLLOWING VIRGINIA BALANCE BILLING LAWS AND RULES, WE PAID THE DOCTOR/FACILITY BASED ON THE MEMBER'S BENEFITS WHEN THEY RECEIVE CARE IN THEIR PLAN'S NETWORK. THE MEMBER IS ONLY RESPONSIBLE FOR THEIR COPAY, PERCENTAGE OF THE COST (COINSURANCE), AND DEDUCTIBLE. THE DOCTOR/FACILITY CAN'T BILL THE MEMBER FOR MORE.

225.    Even though the claim was subject to Virginia's state surprise billing law and not the NSA, on December 14, 2022, Regional sent a notice of open negotiation to Healthkeepers to initiate the federal IDR process on December 14, 2022. The open negotiations notice enclosed a spreadsheet purporting to "negotiate" 316 services from Regional. Again, this tactic of purportedly opening negotiations for more than three-hundred services all at once is part of Defendants' strategy to overwhelm health plans and the IDR process.

226.    Yet despite clear application of Virginia's balance billing laws, on January 31, 2023, SCP, on behalf of Regional and in coordination with AGS, listing the email address scp.reimbursement@agshealth.com on the Notice of IDR Initiation, initiated IDR and falsely attested that the services were a qualified item or service within the scope of the federal IDR process—despite being explicitly informed that the NSA did not apply.   The IDR initiation form was signed by Paul Jordan.

227.    On October 21, 2024, Healthkeepers submitted an objection to eligibility, which was also addressed to Regional at the Dallas PO Box, stating, in relevant part: "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." Despite this explicit notice of ineligibility, neither Regional nor SCP withdrew the dispute—and AGS, acting as their agent in the submission process, continued to press the claim.

228.    As a result of these fraudulent attestations, upon which Healthkeepers justifiably relied, Healthkeepers paid $1,239 for the ineligible service—approximately five times the state-mandated payment amount for the service—along with $445 in unnecessary IDR-related fees.

### *DISP-1032168 (Ineligible State Law Claim)*

229.    The IDR proceeding captioned DISP-1032168 involved a service that Regional rendered on November 10, 2023, to a member of a health plan administered by Healthkeepers.

Regional billed $2,690 for this service using the CPT code 99291. The member's plan is subject to state law and, therefore, Virginia's balance billing laws—rather than the NSA—governed the $267.15 reimbursement rate, as depicted on the original remittance advice below, for the services. Further, because it was not within the NSA's scope, no QPA applied to this service.

230.    When Healthkeepers issued payment on December 13, 2023, the remittance advice sent to Regional at the Dallas PO Box Address reflected and shown below reflected that the claim was processed pursuant to explanation code ARS. The description of this code, printed at the end of the remittance advice, noted: "Following Virginia balance billing laws and rules, we paid the doctor/facility based on the member's benefits when they received care in their plan's network."

| SERVICE DATE(S) | SERVICE CODES | POS | CHARGE | ALLOWED | DEDUCTIBLE | CO-PAY | CO-INSURANCE | CONTRACTUAL DIFFERENCE | PROVIDER RESP. AMOUNT | EXPL/ANSI CODE(S) | INSURED RESPONSIBILITY AMOUNT | EXPL/ANSI CODE(S) | WHAT WE WILL PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSURED'S NAME: | | | | INSURED'S ID: | | | | | PATIENT NAME: | | | | FOR INQUIRIES CALL: |
| PATIENT ACCOUNT#: | | | | CLAIM NUMBER: | | | | | RECEIVED DATE: | 12/07/2023 | | | (855) 856-9286 |
| SERVICE PROVIDER NAME: WESTERN VIRGINIA REGIONAL | | | | SERVICE PROVIDER ID: XXXXX1323 | | | | | EXPL CD: | | | | |
| NETWORK: OUT OF NETWORK | | | | RELATIONSHIP TO INSURED: | | | | PLAN TYPE: HMO | DRG RCVD: N/A | | | | |
| 11/10/2023 11/10/2023 | 99291 | 23 | 2,690.00 | 267.15 | 0.00 | 0.00 | 0.00 | 2,422.85 | 2,422.85 | ARS 45 | 0.00 | | 267.15 |
| | TOTAL: | | 2,690.00 | 267.15 | 0.00 | 0.00 | 0.00 | 2,422.85 | 2,422.85 | | 0.00 | | 267.15 |
| INTEREST | | | | | | | | | | | | | 0.00 |
| | TOTAL NET PAID | | | | | | | | | | | | 267.15 |

ARS          FOLLOWING VIRGINIA BALANCE BILLING LAWS AND RULES, WE PAID THE DOCTOR/FACILITY BASED ON THE MEMBER'S BENEFITS WHEN THEY RECEIVE CARE IN THEIR PLAN'S NETWORK. THE MEMBER IS ONLY RESPONSIBLE FOR THEIR COPAY, PERCENTAGE OF THE COST (COINSURANCE), AND

DEDUCTIBLE. THE DOCTOR/FACILITY CAN'T BILL THE MEMBER FOR MORE.

231.    Even though Regional knew that the claim was subject to Virginia's state surprise billing law and not the NSA, Regional sent a notice of open negotiation to Healthkeepers on January 3, 2024. The open negotiations notice enclosed a spreadsheet purporting to "negotiate" 185 services from Regional. Again, this tactic of purportedly opening negotiations for more than one-hundred and eighty services all at once is part of Defendants' strategy to overwhelm health plans and the IDR process.

232.    Despite clear application of Virginia's balance billing laws and ineligibility of services under the NSA, on February 19, 2024, Regional initiated IDR and falsely attested that the services were a qualified item or service within the scope of the federal IDR process.

233.    On March 27, 2024, Healthkeepers submitted an objection to eligibility, which was also addressed to Regional, stating, in relevant part: (1) "The claim(s) is ineligible under the No Surprise Billing Act", and (2) "This claim does not qualify as IDR items or services under the No Surprise Billing Act." Despite this explicit notice of ineligibility, Regional did not withdraw the dispute.

234.    As a result of these fraudulent attestations, upon which Healthkeepers justifiably relied, Healthkeepers paid $1,334 for the ineligible service—approximately five times the state-mandated payment amount for the service—along with $594 in unnecessary IDR-related fees. Notably, the IDRE sent its Notice of IDR determination to Healthkeepers and scp.reimbursement@agshealth.com.

### DISP-1268253 (Ineligible State Law Claim)

235.    The IDR proceeding captioned DISP-1268253 involved a service that Regional rendered on September 30, 2022, to a member of a fully-insured health plan administered by Healthkeepers. Regional billed $2,089 for this service using the CPT Code 99285. As a fully-insured health plan, the member's plan is subject to state law and, therefore, Virginia's balance billing laws—rather than the NSA—governed the $238.27 reimbursement rate, as depicted on the original remittance advice below, for the services. Further, because it was not within the NSA's scope, no QPA applied to this service.

236.    Despite the claim not being subject to the NSA, on March 6, 2024, Regional sent a notice of open negotiation to Healthkeepers. The open negotiations notice enclosed a spreadsheet purporting to "negotiate" 159 services from Regional. Again, this tactic of purportedly opening negotiations for more than one-hundred and fifty services all at once is part of Defendants' strategy to overwhelm health plans and the IDR process.

237.    Despite clear application of Virginia's balance billing laws, on April 22, 2024, SCP, on behalf of Regional and in coordination with AGS, listing the address idram5@scp-health.com—upon information and belief, one of AGS's AI bots—on the Notice of IDR Initiation, initiated IDR and falsely attested that the services involved a qualified item or service within the scope of the federal IDR process.. The IDR initiation form was signed by Angelina Variet.

238.    On February 10, 2025, Healthkeepers submitted an objection to eligibility, which was also addressed to Regional at the Dallas PO Box, stating, in relevant part: (1) "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies", and (2) "HCN Edit present (this is for Providers in PRR/SIU which are not eligible for IDR)." Despite this explicit notice of ineligibility, neither Regional nor SCP withdrew the dispute—and AGS, acting as their agent in the submission process, continued to press the claim.

239.    As a result of these fraudulent attestations, upon which Healthkeepers justifiably relied, Healthkeepers paid $1,013 for the ineligible service—approximately four times the state-mandated payment amount for the service—along with $512 in unnecessary IDR-related fees.

### *DISP-2188051 (Ineligible State Law Claim)*

240.    The IDR proceeding captioned DISP-2188051 involved a service that Regional rendered on August 24, 2024, to a member of a fully-insured health plan administered by Healthkeepers. Regional billed $2,825 for the service using the CPT code 99291. As a fully-insured plan, the member's plan is subject to state law and, therefore, Virginia's balance billing laws—rather than the NSA—governed the $256.55 reimbursement rate, as depicted on the original remittance advice below, for the services. Further, because it was not within the NSA's scope, no QPA applied to this service.

241.    When Healthkeepers issued payment on or about September 4, 2024, the remittance advice sent to Regional at the Dallas PO Box reflected that the claim was processed pursuant to

explanation code ARS. The description of this code, printed at the end of the remittance advice and reflected below, was: "This was adjusted to follow Virginia balance billing laws and rules. Payment reflects the amount paid based on the member's benefits when they receive care from a doctor/facility in their plan's network."

| INSURED'S NAME: ▉ | | INSURED'S ID: ▉ | | | PATIENT NAME: ▉ | | FOR INQUIRIES CALL: (855) 856-9286 |
|---|---|---|---|---|---|---|---|
| PATIENT ACCOUNT#: | | CLAIM NUMBER: ▉ | | | RECEIVED DATE: 08/30/2024 | | |
| SERVICE PROVIDER NAME: WESTERN VIRGINIA REGIONAL | | SERVICE PROVIDER ID: XXXXX1323 | | | EXPL CD: | | |
| NETWORK: OUT OF NETWORK | | RELATIONSHIP TO INSURED: ▉ | | PLAN TYPE: HMO | DRG RCVD: N/A | | |

| 08/24/2024 08/24/2024 | 99291 | 23 | 2,825.00 | 256.55 | 0.00 | 0.00 | 0.00 | 2,568.45 | 2,568.45 | ARS 45 | 0.00 | 256.55 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL: | | 2,825.00 | 256.55 | 0.00 | 0.00 | 0.00 | 2,568.45 | 2,568.45 | | 0.00 | 256.55 |
| INTEREST | | | | | | | | | | | | 0.00 |
| | TOTAL NET PAID | | | | | | | | | | | 256.55 |

ARS — This was adjusted to follow Virginia balance billing laws and rules. Payment reflects the amount paid based on the member's benefits when they receive care from a doctor/facility in their plan's network. If you disagree with our decision and have documents to support the claim, from Availity.com select the Claims & Payments tab to access Claims Status. Find the claim and select the Dispute button. As a reminder, the member is not responsible for the amount due.

242. On October 16, 2024, even though Regional and SCP knew that the claim was subject to Virginia's balance billing laws, SCP, on behalf of Regional and in coordination with AGS, using the email address idram3@scphealth.com—upon information and belief, one of AGS's AI bots—sent a notice of open negotiation to Healthkeepers. The notice of open negotiation email submission stated "This is an auto-generated email. Please do not reply," and was signed by "Process Automation, upathdev.ags2." The notice of open negotiation was signed by Paul Jordan (SCP) and indicated an email address of Paul_Jordan@scphealth.com and a mailing address of the Lafayette Address.

243. On October 16, 2024, Healthkeepers addressed its response to the notice of open negotiation to Paul Jordan (SCP) at the Lafayette Address. The letter stated and reflected below that the dispute did not qualify for IDR because the claim was not governed by the NSA. Neither Regional, SCP, nor AGS responded to this assertion of ineligibility.

244.     Despite clear application of Virginia's balance billing law, on November 30, 2024, SCP, on behalf of Regional and in coordination with AGS, again listing the email address idram3@scp-health.com—upon information and belief, one of AGS's AI bots—on the Notice of IDR initiation, initiated IDR and falsely attested that the services were a qualified item or service within the scope of the federal IDR process. The IDR initiation form was signed by Becky Bug.

245.     Healthkeepers submitted an objection to eligibility, which was also addressed to Regional at the Lafayette Address, stating that "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." Despite this explicit notice of ineligibility, neither Regional nor SCP withdrew the dispute—and AGS, acting as their agent in the submission process, continued to press the claim.

246.     As a result of these fraudulent attestations, upon which Healthkeepers justifiably relied, Healthkeepers paid $1,406 for the ineligible service—approximately five and a half times the state-mandated payment amount for the service—along with $505 in unnecessary IDR-related fees.

### DISP-2374820 (Ineligible State Law Claim)

247.     The IDR proceeding captioned DISP-2374820 involved a service that Regional rendered on September 22, 2024, to a member of a health plan administered by Healthkeepers. Regional billed $2,825 for the service using the CPT code 99291. As a fully-insured plan, the member's plan is subject to state law and, therefore, Virginia's balance billing laws—rather than the NSA—governed the $256.55 reimbursement rate, as depicted on the original remittance advice below, for the services. Further, because it was not within the NSA's scope, no QPA applied to this service.

248.     When Healthkeepers issued payment on or about October 9, 2024, it sent an EOP toto Regional at the Dallas PO Box, reflecting that the line item was processed pursuant to

explanation code "ARS." The description of this code, printed at the end of the EOP and reflected below, noted: "This was adjusted to follow Virginia balance billing laws and rules. Payment reflects the amount paid based on the member's benefits when they receive care from a doctor/facility in their plan's network."

| SERVICE DATE(S) | SERVICE CODES | POS | CHARGE | ALLOWED | DEDUCTIBLE | CO-PAY | CO-INSURANCE | CONTRACTUAL DIFFERENCE | PROVIDER RESP. AMOUNT | EXPL/ANSI CODE(S) | INSURED RESPONSIBILITY AMOUNT | EXPL/ANSI CODE(S) | WHAT WE WILL PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSURED'S NAME | | | | INSURED'S ID: | | | | | PATIENT NAME: | | | | FOR INQUIRIES CALL: |
| PATIENT ACCOUNT # | | | | CLAIM NUMBER: | | | | | RECEIVED DATE: | 10/02/2024 | | | (855) 856-9286 |
| SERVICE PROVIDER NAME: WESTERN VIRGINIA REGIONAL | | | | SERVICE PROVIDER ID: XXXXX1323 | | | | | EXPL CD: | | | | |
| NETWORK | | | | RELATIONSHIP TO INSURED: | | | | PLAN TYPE: HMO | DRG RCVD: N/A | | | | |
| 09/22/2024 09/22/2024 | 99291 | 23 | 2,825.00 | 256.55 | 0.00 | 0.00 | 64.14 | 2,568.45 | 2,568.45 | ARS 45 | 64.14 | 067 2 | 192.41 |
| INTEREST | TOTAL: | | 2,825.00 | 256.55 | 0.00 | 0.00 | 64.14 | 2,568.45 | 2,568.45 | | 64.14 | | 192.41 |
| | | | | | | | | | | | | | 0.00 |
| | TOTAL NET PAID | | | | | | | | | | | | 192.41 |

ARS       This was adjusted to follow Virginia balance billing laws and rules. Payment reflects the amount paid based on the member's benefits when they receive care from a doctor/facility in their plan's network. If you disagree with our decision and have documents to support the claim, from Availity.com select the Claims & Payments tab to access Claims Status. Find the claim and select the Dispute button. As a reminder, the member is not responsible for the amount due.

249. On November 20, 2024, even though Regional and SCP knew that the claim was subject to state law, SCP, on behalf of Regional and in coordination with AGS, using the email address idram3@scphealth.com—upon information and belief, one of AGS's AI bots—sent a notice of open negotiation to Healthkeepers. The notice of open negotiation was signed by Paul Jordan (SCP) and indicated an email address of Paul_Jordan@scphealth.com and a mailing address at the Lafayette Address.

250. On November 25, 2024, Healthkeepers addressed its response to the notice of open negotiation to Paul Jordan (SCP) at the Lafayette Address. The letter stated that the dispute did not qualify for IDR because the claim was not governed by the NSA. Neither Regional, SCP, nor AGS responded to this assertion of ineligibility.

251. Despite clear application of Virginia's balance billing law, on January 7, 2025, SCP, on behalf of Regional and in coordination with AGS, listing the email address idram6@scp-health.com—upon information and belief, one of AGS's AI bots—on the Notice of IDR Initiation,

initiated IDR and falsely attested that the services were a qualified item or service within the scope of the federal IDR process. The IDR initiation form was signed by Breon Terrance.

252. Healthkeepers submitted an objection to eligibility, which was also addressed to Regional at the Lafayette Address, stating that "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." Despite this explicit notice of ineligibility, neither Regional nor SCP withdrew the dispute—and AGS, acting as their agent in the submission process, continued to press the claim.

253. As a result of these fraudulent attestations, upon which Healthkeepers justifiably relied, Healthkeepers paid $1,341.86 for the ineligible service—approximately five times the state-mandated payment for the service—along with $613 in unnecessary IDR-related fees.

**E.     Wildwood Emergency Group**

***DISP-166754 (Ineligible State Law Claim)***

254. The IDR proceeding captioned DISP-166754 involved a service that Wildwood rendered on August 13, 2022, to a member of a health plan administered by Anthem BCBS. Wildwood billed $2,690 for this service using the CPT Code 99291. As a fully-insured plan, the member's plan is subject to state law and, therefore, Virginia's balance billing laws—rather than the NSA—governed the $337.35 reimbursement rate, as depicted on the original remittance advice below, for the services. Further, because it was not within the scope of the NSA, no QPA applied to this service.

255. When Anthem BCBS issued payment on or about October 5, 2022, it sent an EOP to Wildwood at the Dallas PO Box, reflecting that the line item was processed pursuant to explanation code "ARS." The description of this code, printed at the end of the EOP, and reflected below, noted: "Following Virginia balance billing laws and rules, we paid the doctor/facility based on the member's benefits when they received care in their plan's networks."

| SERVICE DATE(S) | SERVICE CODES | POS | CHARGE | ALLOWED | DEDUCTIBLE | CO-PAY | CO-INSURANCE | CONTRACTUAL DIFFERENCE | PROVIDER RESP. AMOUNT | EXPL/ANSI CODE(S) | INSURED RESPONSIBILITY AMOUNT | EXPL/ANSI CODE(S) | WHAT WE WILL PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSURED'S NAME:    PATIENT ACCOUNT #:    SERVICE PROVIDER NAME: WILDWOOD EMERGENCY GROUP    NETWORK: | | | | INSURED'S ID:    CLAIM NUMBER:    SERVICE PROVIDER ID: XXXXX2858    RELATIONSHIP TO INSURED: | | | | PATIENT NAME:    RECEIVED DATE: 10/03/2022    EXPL CD:    PLAN TYPE: PPO    DRG RCVD: N/A | | | FOR INQUIRIES CALL: (833) 592-9956 | | |
| 08/13/2022 08/13/2022 | 99291 | 23 | 2,690.00 | 337.35 | 0.00 | 0.00 | 0.00 | 2,352.65 | 2,352.65 | ARS 45 | 0.00 | | 337.35 |
| INTEREST | TOTAL: | | 2,690.00 | 337.35 | 0.00 | 0.00 | 0.00 | 2,352.65 | 2,352.65 | | 0.00 | | 337.35 |
| | | | | | | | | | | | | | 0.00 |
| | TOTAL NET PAID | | | | | | | | | | | | 337.35 |

| | |
|---|---|
| ARS | FOLLOWING VIRGINIA BALANCE BILLING LAWS AND RULES, WE PAID THE DOCTOR/FACILITY BASED ON THE MEMBER'S BENEFITS WHEN THEY RECEIVE CARE IN THEIR PLAN'S NETWORK. THE MEMBER IS ONLY RESPONSIBLE FOR THEIR COPAY, PERCENTAGE OF THE COST (COINSURANCE), AND DEDUCTIBLE. THE DOCTOR/FACILITY CAN'T BILL THE MEMBER FOR MORE. |

256.　Despite the claim not being subject to the NSA, on October 19, 2022, Wildwood sent a notice of open negotiation to Anthem BCBS. The open negotiations notice enclosed a spreadsheet purporting to "negotiate" 37 services from Wildwood. Again, this tactic of purportedly opening negotiations for more than thirty services all at once is part of Defendants' strategy to overwhelm health plans and the IDR process.

257.　Despite clear application of Virginia's balance billing laws, on December 6, 2024, SCP, on behalf of Wildwood and in coordination with AGS, initiated IDR listing the email address, scp.reimbursement@agshealth.com on the Notice of IDR Initiation, and falsely attested that the services were a qualified item or service within the scope of the federal IDR process. The IDR initiation form was signed by Paul Jordan.

258.　On December 17, 2024, Anthem submitted an objection to eligibility, which was also addressed to Wildwood at the Dallas PO Box, stating, in relevant part: "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." Despite this explicit notice of ineligibility, neither Wildwood nor SCP withdrew the dispute—and AGS, acting as their agent in the submission process, continued to press the claim.

259.　As a result of these fraudulent attestations, upon which Anthem BCBS justifiably relied, Anthem BCBS paid $1,239 for the ineligible service—approximately four times the state-mandated payment amount for the service—along with $445 in unnecessary IDR-related fees.

### *DISP-425697 (Ineligible State Law Claim)*

260.    The IDR proceeding captioned DISP-425697 involved a service that Wildwood rendered on December 14, 2022, to a member of a health plan administered by Anthem BCBS. Wildwood billed $2,089 for this service using CPT Code 99285. As a fully-insured plan, the member's plan is subject to state law and, therefore, Virginia's balance billing laws—rather than the NSA—governed the $266.30 reimbursement rate, as depicted on the original remittance advice below, for the services. Further, because it was not within the NSA's scope, no QPA applied to this service.

261.    When Anthem BCBS issued payment on or about March 1, 2023, it sent an EOP to Wildwood at the Dallas PO Box, reflecting that the line item processed pursuant to explanation code "ARS." The description of this code, printed at the end of the EOP and reflected below, noted: "Following Virginia balance billing laws and rules, we paid the doctor/facility based on the member's benefits when they received care in their plan's networks."

| SERVICE DATE(S) | SERVICE CODES | POS | CHARGE | ALLOWED | DEDUCTIBLE | CO-PAY | CO-INSURANCE | CONTRACTUAL DIFFERENCE | PROVIDER RESP. AMOUNT | EXPL/ANSI CODE(S) | INSURED RESPONSIBILITY AMOUNT | EXPL/ANSI CODE(S) | WHAT WE WILL PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INSURED'S NAME: PATIENT ACCOUNT#: SERVICE PROVIDER NAME: WILDWOOD EMERGENCY GROUP NETWORK: | | | INSURED'S ID: CLAIM NUMBER: SERVICE PROVIDER ID: XXXXX2858 RELATIONSHIP TO INSURED: | | | | | PLAN TYPE: PPO | PATIENT NAME: RECEIVED DATE: 02/03/2023 EXPL CD: DRG RCVD: N/A | | | FOR INQUIRIES CALL: (833) 592-9956 | |
| 12/14/2022 12/14/2022 | 99285 | 23 | 2,089.00 | 266.30 | 0.00 | 0.00 | 53.26 | 1,822.70 | 1,822.70 | ARS 45 | 53.26 | 067 2 | 213.04 |
| | TOTAL: | | 2,089.00 | 266.30 | 0.00 | 0.00 | 53.26 | 1,822.70 | 1,822.70 | | 53.26 | | 213.04 |
| INTEREST | | | | | | | | | | | | | 0.18 |
| | TOTAL NET PAID | | | | | | | | | | | | 213.22 |

ARS    FOLLOWING VIRGINIA BALANCE BILLING LAWS AND RULES, WE PAID THE DOCTOR/FACILITY BASED ON THE MEMBER'S BENEFITS WHEN THEY RECEIVE CARE IN THEIR PLAN'S NETWORK. THE MEMBER IS ONLY RESPONSIBLE FOR THEIR COPAY, PERCENTAGE OF THE COST (COINSURANCE), AND DEDUCTIBLE. THE DOCTOR/FACILITY CAN'T BILL THE MEMBER FOR MORE.

262.    Despite the claim not being subject to the NSA, on April 12, 2023, Wildwood sent a notice of open negotiation to Anthem BCBS. The open negotiations notice enclosed a spreadsheet purporting to "negotiate" 59 services from Wildwood. Again, this tactic of purportedly opening negotiations for more than fifty services all at once is part of Defendants' strategy to overwhelm health plans and the IDR process.

263. Despite clear application of Virginia's balance billing laws, SCP, on behalf of Wildwood and in coordination with AGS, initiated IDR listing the email address idram6@scp-health.com—upon information and belief, one of AGS's AI bots—on the Notice of IDR Initiation and falsely attested that the services were a qualified item or service within the scope of the federal IDR process. The IDR initiation form was signed by Breon Terrance.

264. On June 28, 2024, Anthem submitted an objection to eligibility, which was also addressed to Wildwood at the Dallas PO Box, stating: "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." Despite this explicit notice of ineligibility, neither Wildwood nor SCP withdrew the dispute—and AGS, acting as their agent in the submission process, continued to press the claim.

265. As a result of these fraudulent attestations, upon which Anthem BCBS justifiably relied, Anthem BCBS paid $959.74 for the ineligible service—approximately three and a half times the state-mandated payment amount for the service—along with $445 in unnecessary IDR-related fees.

### DISP-788337 (Ineligible State Law Claim)

266. The IDR proceeding captioned DISP-788337 involved a service that Wildwood rendered on July 7, 2023, to a member of a health plan administered by Healthkeepers. Wildwood billed $2,089 for this service using CPT Code 99285. As a fully-insured plan, the member's plan is subject to state law and, therefore, Virginia's balance billing laws—rather than the NSA—governed the $263.76 reimbursement rate, as depicted on the original remittance advice below, for the services. Further, because it was not within the NSA's scope, no QPA applied to this service.

267. When Healthkeepers issued payment on or about September 20, 2023, it sent an EOP to Wildwood at the Dallas PO Box, reflecting that the claim was processed pursuant to explanation code "ATB." The description of this code, printed at the end of the EOP and reflected

below, noted: "Following Virginia balance billing laws and rules, we paid the doctor/facility based on the member's benefits when they receive care in their plan's network."

| SERVICE DATE(S) | SERVICE CODES | POS | CHARGE | ALLOWED | DEDUCTIBLE | CO-PAY | CO-INSURANCE | CONTRACTUAL DIFFERENCE | PROVIDER RESP. AMOUNT | EXPL/ANSI CODE(S) | INSURED RESPONSIBILITY AMOUNT | EXPL/ANSI CODE(S) | WHAT WE WILL PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

INSURED'S NAME: ▉  PATIENT ACCOUNT#: ▉  SERVICE PROVIDER NAME: WILDWOOD EMERGENCY GROUP  NETWORK: ▉  INSURED'S ID: ▉  CLAIM NUMBER: ▉  SERVICE PROVIDER ID: XXXXX285B  RELATIONSHIP TO INSURED: ▉  PATIENT NAME: ▉  RECEIVED DATE: 08/28/2023  EXPL CD:  PLAN TYPE: POS  DRG RCVD: N/A  FOR INQUIRIES CALL: (855) 856-9286

| 07/07/2023 07/07/2023 | 99285 | 23 | 2,089.00 | 263.76 | 0.00 | 0.00 | 0.00 | 1,825.24 | 1,825.24 | ATB 45 | 0.00 | | 263.76 |
| | TOTAL: | | 2,089.00 | 263.76 | 0.00 | 0.00 | 0.00 | 1,825.24 | 1,825.24 | | 0.00 | | 263.76 |
| INTEREST | | | | | | | | | | | | | 0.00 |
| | TOTAL NET PAID | | | | | | | | | | | | 263.76 |

ATB     FOLLOWING VIRGINIA BALANCE BILLING LAWS AND RULES, WE PAID THE DOCTOR/FACILITY BASED ON THE MEMBER'S BENEFITS WHEN THEY RECEIVE CARE IN THEIR PLAN'S NETWORK. THE MEMBER IS ONLY RESPONSIBLE FOR THEIR COPAY, PERCENTAGE OF THE COST (COINSURANCE), AND DEDUCTIBLE. IN THE FUTURE, IF WE MAKE AN ADDITIONAL PAYMENT TO THE DOCTOR/FACILITY FOR THIS CARE, THE MEMBER MAY OWE MORE IF THEY HAVEN'T MET THEIR DEDUCTIBLE.

268. Despite the claim not being subject to the NSA, on October 18, 2023, Wildwood sent a notice of open negotiation to Healthkeepers. The open negotiations notice enclosed a spreadsheet purporting to "negotiate" 152 services from Wildwood. Again, this tactic of purportedly opening negotiations for more than 150 services at once is part of Defendants' strategy to overwhelm health plans and the IDR process.

269. Despite clear application of Virginia's balance billing laws, on December 1, 2023, SCP, on behalf of Wildwood and in coordination with AGS, initiated IDR listing the email address scp.reimbursement@agshealth.com on the Notice of IDR Initiation and falsely attested that the services were a qualified item or service within the scope of the federal IDR process. The IDR initiation form was signed by Paul Jordan.

270. On December 4, 2024, Healthkeepers submitted an objection to eligibility, which was also addressed to Wildwood at the Dallas PO Box, stating, in relevant part: "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies." Despite this explicit notice of ineligibility, neither Wildwood nor SCP withdrew the dispute—and AGS, acting as their agent in the submission process, continued to press the claim.

271.     As a result of these fraudulent attestations, upon which Healthkeepers justifiably relied, Healthkeepers paid $1,091 for the ineligible service—approximately six times the state-mandated payment amount for the service—along with $447 in unnecessary IDR-related fees.

### *DISP-1345991 (Ineligible State Law Claim)*

272.     The IDR proceeding captioned DISP-1345991 involved a service that Wildwood rendered on January 14, 2024, to a member of a health plan administered by Anthem BCBS. Wildwood billed $2,194 for the service using CPT code 99285. The member's plan is subject to state law and, therefore, Virginia's balance billing laws—rather than the NSA—governed the $263.67 reimbursement rate, as depicted on the original remittance advice below, for the services. Further, because it was not within the NSA's scope, no QPA applied to this service.

273.     When Anthem BCBS issued payment on or about February 22, 2024, it sent an EOP to Wildwood at the Dallas PO Box, reflecting that the line item was processed pursuant to explanation code "ARS." The description of this code, printed at the end of the EOP and reflected below, was: "Following Virginia balance billing laws and rules, we paid the doctor/facility based on the member's benefits when they receive care in their plan's network. The member is only responsible for their copay, percentage of the cost (coinsurance), and deductible. The doctor/facility can't bill the member for more."



274.     Despite the claim not being subject to the NSA, on April 3, 2024, Wildwood sent a notice of open negotiation to Anthem BCBS. The open negotiations notice enclosed a spreadsheet

purporting to "negotiate" 89 services from Wildwood. Again, this tactic of purportedly opening negotiations for more than eighty-five services all at once is part of Defendants' strategy to overwhelm health plans and the IDR process.

275. On May 17, 2024, SCP, on behalf of Wildwood and in coordination with AGS, listing the email address idram3@scp-health.com—upon information and belief, one of AGS's AI bots—on the Notice of IDR Initiation, initiated IDR and falsely attested that the services were a qualified item or service within the scope of the federal IDR process. The IDR initiation form was signed by Becky Bug.

276. Anthem submitted an objection eligibility, which was also address to Wildwood at the Dallas PO Box, stating, in relevant part: "The claim(s) is ineligible for IDR under the NSA because a state surprise billing law applies.;" Despite this explicit notice of ineligibility, neither Ingleside nor SCP withdrew the dispute—and AGS, acting as their agent in the submission process, continued to press the claim.

277. As a result of these fraudulent attestations, upon which Anthem BCBS justifiably relied, Anthem BCBS paid $1,150 for the ineligible service—approximately four times the state-mandated payment amount for the service—along with $512 in unnecessary IDR-related fees.

## CLAIMS FOR RELIEF

**COUNT I**
**VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")**
**18 U.S.C. § 1962(c)**
**(Against All Defendants)**

278. Anthem repeats and realleges the allegations in Paragraphs 1 through 277 in this Complaint as if fully set forth at length herein.

279. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

280. At all relevant times, AGS, SCP, and the Provider Defendants, individually, are "persons" under 18 U.S.C. §1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property." The SCP Enterprise and the individuals therein conduct their business through corporate entities, each of which is a separate legal entity. Defendants are each "persons" distinct from the SCP Enterprise.

281. The SCP Enterprise is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of AGS, SCP, and the Provider Defendants, including their employees, owners, and agents.

282. The SCP Enterprise is an ongoing organization that functions as a continuing unit. The SCP Enterprise was created for and used as a vehicle to effectuate a pattern of racketeering activity. The SCP Enterprise shares a common purpose of furthering the illegal scheme to maximize their revenues and profits at the expense of Anthem by fraudulently inducing and compelling Anthem to engage in the IDR process which Anthem would otherwise not be legally required to participate in, and to also pay exorbitant amounts for services that were not eligible for the IDR process.

283. The members of the SCP Enterprise are systematically linked to each other through contractual relationships, financial ties, shared correspondence, common addresses for correspondence and receipt of payment, and continuing coordination of activities.

284. Each member of the SCP Enterprise conducted or participated in the operation and management of the RICO enterprise by directing its affairs, including through a pattern of

racketeering activity, and shared in the profits illicitly obtained as a result of the enterprise's fraudulent course of conduct.

285.    The SCP Enterprise is distinct from and has an existence beyond the pattern of racketeering described herein, namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of wire fraud described herein, by providing out-of-network services to patients, creating and maintaining records (including claims for such services), leveraging technology to submit ineligible claims to the IDR Portal at scale, and artificially inflating their chances to "win" in the IDR process by overwhelming IDREs with fraudulent and inflated submissions.

286.    Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*e.g.*, wire fraud in violation of U.S.C. § 1343) within the past ten years. The multiple acts of racketeering activity that the Defendants committed, or aided and abetted in the commission of, were related to each other and posed a threat of continued racketeering activity and therefore constitute a "pattern of racketeering activity." The predicate acts also had the same or similar results, participants, victims (including Anthem), and methods. The predicate acts were related and not isolated events.

287.    Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by interstate wire for the purpose of executing the unlawful scheme to defraud funds from Anthem by means of false pretenses, misrepresentations, promises and omissions.

288.    Defendants' predicate acts of racketeering—which began no later than January 3, 2024, and have occurred continuously and systematically through the present day—committed by

interstate wires, include knowingly submitting claims that were ineligible for the IDR process and knowingly demanding payments far in excess of commercially reasonable amounts. These predicate acts include: submitting services and disputes through the online IDR eligibility portal that were ineligible for the IDR process; initiating thousands of disputes at the same time and in such a way as to make it impossible for Anthem to reasonably identify and object to all ineligible disputes; demanding outrageous payments far in excess of their charges, much less a commercially reasonable amount; engaging in the IDR process in bad faith; and procuring payments from Anthem on claims that were ineligible for IDR via interstate wire.

289.    The SCP Enterprise profited substantially from the enterprise, ultimately receiving millions in illicitly obtained payments from Anthem and further damaging Anthem by hundreds of thousands of dollars in additional fees.

290.    The SCP Enterprise received payment for the fraudulent claims directly from Anthem through the interstate wire facilities in violation of 18 U.S.C. § 1343. Each such payment constituted a separate wire fraud violation. Each of these violations was related because they shared the common purpose of defrauding Anthem.

291.    At all relevant times, Anthem paid Defendants directly for the out-of-network services subject to the NSA Scheme.

292.    The SCP Enterprise's fraudulent conduct and racketeering activity described herein has directly and proximately caused harm to Anthem in its business and property.

293.    By reason of its injury, Anthem is entitled to compensatory, punitive, and treble damages, pre- and post-judgment interest, attorney's fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

**COUNT II**
**CONSPIRACY TO VIOLATE RICO ACT 18 U.S.C. § 1962(d)**
**(Against All Defendants)**

294.　　Anthem repeats and realleges the allegations in Paragraphs 1 through 277 contained in this Complaint as if fully set forth herein.

295.　　At all relevant times, AGS, SCP, and the Provider Defendants violated 18 U.S.C. § 1962(d) by conspiring together to violate 18 U.S.C. § 1962(c). The object of the conspiracy was to conduct or participate, directly or indirectly, in the conduct of the affairs of the SCP Enterprise in furtherance of the NSA Scheme through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. § 1343 (wire fraud) and unlawful activity in violation of 18 U.S.C. § 1952 (use of interstate facilities to conduct unlawful activity).

296.　　The nature of the NSA Scheme, including the material false statements, misrepresentations, and attestations made in furtherance of the conspiracy, gives rise to an inference that Defendants not only agreed to the objective of a 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were also aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

297.　　Defendants' agreement, overt acts, and predicate acts, as set forth more fully above, directly injured and proximately caused harm to Anthem in its businesses and property by reason of the SCP Enterprise's racketeering activity.

298.　　Accordingly, by reason of the allegations herein, Anthem is entitled to compensatory, punitive, and treble damages, pre- and post-judgment interest, attorney's fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

**COUNT III**
**CONSPIRACY TO INJURE ANOTHER IN TRADE, BUSINESS OR PROFESSION**
VA. CODE ANN. §§ 18.2-499, -500
**(Against All Defendants)**

299. Anthem repeats and realleges the allegations in Paragraphs 1 through 277 contained in this Complaint as if fully set forth at length herein.

300. This is a statutory claim under the Virginia Business Conspiracy statute, VA. CODE ANN. §§ 18.2-499-500.

301. Section 18.2-499(A) of the Virginia Code makes it unlawful for "[a]ny two or more persons [to] combine, associate, agree, mutually undertake or concert together for the purpose of…willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever." VA. CODE ANN. § 18.2-499(A).

302. Section 18.2-499(B) of the Virginia Code also prohibits "attempts to procure the participation, cooperation, agreement or other assistance of any one or more persons to enter into any combination, association, agreement, mutual understanding or concert" prohibited by the statute. *Id.* § 18.2-499(B).

303. Section 18.2-500(A) of the Virginia Code further provides that "any person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499, may sue therefor and recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel, and without limiting the generality of the term, 'damages' shall include loss of profits." *Id.* § 18.2-501(b).

304. SCP, AGS, and the Provider Defendants are each "person[s]" as defined by the Statutes. *See id.* § 18.2-501(b) ("As used in this article a 'person' is any person, firm, corporation, partnership, or association.").

305.    As set forth herein, upon information and belief, SCP and the Provider Defendants, in concert with parties known and unknown, including but not limited to AGS, acted together to effect a preconceived plan to willfully and maliciously injure Anthem in its reputation, trade, business, and/or profession by conspiring to (1) fraudulently submit false attestations of IDR eligibility to Anthem, the IDREs, and the Departments that Defendants knew to be false, (2) falsely represent to Anthem that the disputes were eligible for IDR prior to initiating the IDR process, and (3) knowingly misrepresent the QPA for the service and submit outrageously high payment offers that they could never receive on the open market, and that sometimes even exceed the Provider Defendants' billed charges—all done with the intent to obtain money owned or controlled by Anthem under the false pretense that the disputes were eligible for resolution through the IDR process.

306.    Alternatively, upon information and belief, SCP and the Provider Defendants attempted to procure the participation, cooperation, agreement or other assistance of parties, known and unknown, including but not limited to AGS, to (1) fraudulently submit false attestations of IDR eligibility to Anthem, the IDREs, and the Departments that Defendants knew or should have known to be false, (2) falsely represent to Anthem that the disputes were eligible for IDR prior to initiating the IDR process, and (3) knowingly misrepresent the QPA for the service and submit outrageously high payment offers that they could never receive on the open market, and that sometimes even exceed the Provider Defendants' billed charges—all done with the intent to obtain money owned or controlled by Anthem under the false pretense that the disputes were eligible for resolution through the IDR process.

307.    Defendants, by and through their corporate agents, took many affirmative steps in furtherance of their conspiracy, including but not limited to, fraudulently submitting false

attestations of IDR eligibility, making false representations to Anthem that the disputes were eligible for IDR prior to initiating the IDR process, and obtaining IDR judgments based on these knowingly false representations of eligibility.

308.    In all acts and omissions complained of herein, Defendants acted willfully, fraudulently, and maliciously to harm Anthem's business. Specifically, Defendants acted without lawful justification or lawful purpose to fraudulently obtain monies from Anthem based on numerous knowingly false pretenses and representations.

309.    As a direct and proximate result of Defendants' conspiratorial conduct, Anthem suffered and continues to suffer significant harm to its business, including but not limited to the loss of control of millions of dollars, loss of profit, and the accumulation of attorneys' fees in defending against the fraudulent IDR claims and pursuing this Action.

310.    Accordingly, Defendants are liable to Anthem for violation of the Virginia Business Conspiracy statute, VA. CODE ANN. §§ 18.2-499, -500, and Anthem is entitled to treble economic damages and its reasonable attorneys' fees, together with costs and reasonable expenses incurred in connection with this Action arising out of Defendants' fraudulent schemes.

## COUNT IV
## VIOLATION OF VIRGINIA'S UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
## VA. CODE ANN. §§ 59.1-196 *et seq.*
### (Against All Defendants)

311.    Anthem repeats and realleges the allegations in Paragraphs 1 through 277 contained in this Complaint as if fully set forth at length herein.

312.    Defendants engaged in fraudulent acts and practices in violation of the Virginia Consumer Protection Act, VA. CODE ANN. § 59.1-196 *et seq.*

313. Anthem and Defendants fit the definition of "person," and Defendants' out-of-network services wrongfully billed to Anthem meet the definition of "consumer transaction" under VA. CODE ANN. § 59.1-198.

314. Through the fraudulent and deceptive acts and practices alleged herein, including, for example, willfully misrepresenting to Anthem, the IDREs, and the Departments that items or services were eligible for IDR resolution when they were not, Defendants misrepresented that the items or services had "sponsorship, approval, or certification" when in fact the items and services did not, in violation of VA. CODE ANN. § 59.1-200

315. Defendants' fraudulent course of conduct also constitutes "deception, fraud, false pretense, false promise, and misrepresentation[,]" in further violation of VA. CODE ANN. § 59.1-200.

316. Defendants' violations of the Virginia Consumer Protection Act were willful.

317. Defendants' acts have directly and proximately caused substantial economic harm to Anthem.

318. Accordingly, Anthem is entitled to recover damages, including treble damages, and attorney's fees, costs, and expenses in connection with bringing this action.

**COUNT V**
**COMMON LAW FRAUD/FRAUDULENT MISREPRESENTATION**
**(Against All Defendants)**

319. Anthem repeats and realleges the allegations in Paragraphs 1 through 277 contained in this Complaint as if fully set forth at length herein.

320. SCP, the Provider Defendants, and AGS knowingly and willfully executed the scheme described herein with the intent to defraud Anthem. This scheme included SCP, the Provider Defendants, and AGS on behalf of and in coordination with SCP and the Provider Defendants (1) submitting knowingly false attestations of IDR eligibility to Anthem, the IDREs,

and the Departments and (2) falsely representing to Anthem, the IDREs, and the Departments that the disputes were eligible for IDR prior to initiating the IDR process, all done with the intent to obtain money owned or controlled by Anthem and its affiliated health plans under the false pretense that the disputes were eligible for resolution through the IDR process.

321.    As shown in the exemplary IDR disputes above, this scheme consisted of (1) AGS submitting open negotiations notices to Anthem and IDR initiation notices directly to Anthem, the IDREs, and the Departments on behalf of and in coordination with SCP and the Provider Defendants SCP wholly controlled or (2) SCP, on behalf of and in coordination with the Provider Defendants they wholly controlled, submitting open negotiations notices to Anthem and IDR initiation notices directly to Anthem, the IDREs, and the Departments in coordination with AGS and through the use of AGS's "AI bot" email addresses.

322.    For each of the ineligible IDRs that Defendants initiated, AGS, on behalf of and in coordination with SCP and the Provider Defendants, or SCP, on behalf of the Provider Defendants and in coordination with AGS and the Provider Defendants, made materially false statements, representations, and attestations in order to initiate the IDRs described herein to the Departments, and submitted a completed version of the mandatory IDR Notice of Initiation Form to Anthem, the IDREs, and the Departments, which, in part, contained the following attestation:

> I, the undersigned initiating party (or representative of the initiating party), attests that to the best of my knowledge…the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.

323.    Yet, as discussed herein, thousands of these attestations were clearly false, as the underlying services were not qualified items or services, and in fact, the disputes were ineligible for resolution through the NSA's IDR process.

324.    AGS, on behalf of and in coordination with SCP and the Provider Defendants, or SCP on behalf of the Provider Defendants and in coordination with AGS and the Provider Defendants, submitted the IDR Notice of Initiation Form in each such dispute with full knowledge of the falsity of this attestation. From the patient's insurance cards, Anthem's EOPs, Anthem's open negotiations and IDR communications to Defendants, the plain text of federal laws and regulations, CMS publications and resources, Defendants' preparation of IDR initiation forms and notices, their participation in the IDR process, and the specific objections to eligibility that Anthem submitted to the Provider Defendants and SCP, the Provider Defendants, SCP, and AGS (by operation AGS's coordination with SCP and the Provider Defendants) knew that the services and disputes they were initiating were ineligible for the IDR process.

325.    AGS, on behalf of and in coordination with SCP and the Provider Defendants, or SCP on behalf of the Provider Defendants and in coordination with AGS and the Provider Defendants, nevertheless submitted these false attestations and did so with the intent that Anthem, the IDREs, and the Departments rely on them. Anthem was, in fact, compelled to rely on the false attestations because Anthem was forced to expend resources and incur expenses, including in the form of considerable operational burden and expense and non-refundable administrative fees, and it was forced to proceed to a payment determination, despite the dispute's ineligibility.

326.    According to federal law, "the certified IDR entity selected must review the information submitted in the notice of IDR initiation"—including false attestations of eligibility submitted by AGS, on behalf of and in coordination with SCP and the Provider Defendants, or SCP on behalf of the Provider Defendants and in coordination with AGS and the Provider Defendants—"to determine whether the Federal IDR process applies." 45 C.F.R. § 149.510(c)(1)(v). Even if Anthem contested eligibility, SCP, the Provider Defendants, and AGS

knew and expected their deliberate misrepresentations would force Anthem to reasonably and foreseeably rely on the misrepresentations, incur the required administrative fees, and proceed to a payment determination, despite the ineligibility of the dispute.

327.    As described above, these false statements, representations, and attestations were submitted by corporate agents and digital workers using corporate email addresses—including scp.reimbursement@agshealth.com, idram5@scp-health.com, idram3@scp-health.com, and idram6@scp-health.com—which, upon information and belief, was an attempt to conceal the identity of the individuals submitting the false attestations. As parties to IDR have no ability to engage in discovery—in fact, the parties submit final offers and supporting evidence in a blind process without the right or ability to see the other party's submission—the submission of false attestations achieved the concealment of the corporate actors filing the false attestations.

328.    From January 2024, to August 2025, AGS, on behalf of and in coordination with SCP and the Provider Defendants, or SCP on behalf of the Provider Defendants and in coordination with AGS and the Provider Defendants, submitted thousands of false attestations, including, for example, the disputes specifically referenced above.

329.    These false attestations of eligibility pertain to material facts in the IDR process because they bypass the safeguards that the Departments created to prevent ineligible disputes and go to the heart of the IDRE's jurisdiction to even hear the dispute.

330.    Defendants knew that the services the Provider Defendants rendered and disputes they were initiating were ineligible for the IDR process. For example, AGS, on behalf of and in coordination with SCP and the Provider Defendants, or SCP on behalf of the Provider Defendants and in coordination with AGS and the Provider Defendants, submitted the IDR notice of initiation

in each dispute with full knowledge of, or at the very least with reckless disregard to, the falsity of this attestation.

331.     AGS, on behalf of and in coordination with SCP and the Provider Defendants, or SCP on behalf of the Provider Defendants and in coordination with AGS and the Provider Defendants, nevertheless made false statements, representations, and attestations with the intent to deceive the Departments, the IDREs, and Anthem.

332.     It was the intent and object of Defendants' NSA Scheme to fraudulently induce Anthem to pay for out-of-network services in amounts that are far in excess of what Defendants were entitled by law to receive. AGS, on behalf of and in coordination with SCP and the Provider Defendants, or SCP on behalf of the Provider Defendants and in coordination with AGS and the Provider Defendants, submitted the false attestations to receive a windfall for themselves, namely, IDR payment determinations in favor of the Provider Defendants and against Anthem regarding items or services that were ineligible for resolution through the IDR process.

333.     Anthem reasonably and justifiably relied on the false statements, representations, and attestations made by AGS, on behalf of and in coordination with SCP and the Provider Defendants, or SCP on behalf of the Provider Defendants and in coordination with AGS and the Provider Defendants, including those made directly to Anthem and to the IDREs and the Departments, and incurred significant monetary losses through incurring fees required by the NSA and in the form of IDR payment determinations. Anthem rightfully relied—and had to rely—on these false statements, representations, and attestations.

334.     AGS, on behalf of and in coordination with SCP and the Provider Defendants, or SCP on behalf of the Provider Defendants and in coordination with AGS and the Provider Defendants, also fraudulently misrepresented to Anthem during the statutorily required open

negotiations process that the disputes were eligible for IDR and involved qualified IDR items and services meeting the NSA and regulatory definitions of that term.

335.    Anthem reasonably, foreseeably, and justifiably relied on these misrepresentations during the open negotiations and IDR initiation process. As part of the fraudulent scheme described herein, Defendants' tactic to strategically flood the IDR process and overwhelm the system precluded Anthem from investigating each and every aspect of the thousands of disputes they submitted within the 30-day open negotiations window or within three days of IDR initiation, intending that Anthem would rely on these false representations of eligibility. Additionally, in some cases (such as when the patient waived balance billing protections), Defendants are the only entities in possession of information critical to Anthem's ability to assess a claim for IDR eligibility, such as information pertaining to the provider, types of services rendered, and patient records. Thus, the Provider Defendants, SCP, and AGS knew Anthem was often incapable of knowing the falsity of these misrepresentations. As a result, Anthem justifiably relied on these misrepresentations that the disputes were eligible for IDR and incurred significant monetary losses, including through incurring fees required by the NSA and in the form of IDR payment determinations finding against Anthem.

336.    As a direct and proximate result of the fraudulent misrepresentations by AGS, on behalf of and in coordination with SCP and the Provider Defendants, or SCP on behalf of the Provider Defendants and in coordination with AGS and the Provider Defendants, Anthem has suffered substantial damages in the form of payment of fees required by the NSA and on IDR payment determinations that were ineligible for resolution through the NSA's IDR process.

337.    At all relevant times, Anthem exercised reasonable diligence in investigating the conduct of each of the Defendants with respect to the NSA Scheme.

338. Each member of the SCP Enterprise formed and operated in a conspiracy to defraud Anthem through this scheme, and each committed acts in furtherance thereof, resulting in the above-stated damages to Anthem.

339. Accordingly, Anthem is entitled to recover damages, including punitive damages and attorneys' fees and costs, against Defendants.

**COUNT VI**
**CONSTRUCTIVE FRAUD**
**(Against All Defendants)**

340. Anthem repeats and realleges the allegations in Paragraphs 1 through 277 contained in this Complaint as if fully set forth at length herein.

341. In submitting the false attestations of eligibility, AGS, on behalf of and in coordination with SCP and the Provider Defendants, or SCP on behalf of the Provider Defendants and in coordination with AGS and the Provider Defendants, misrepresented material facts to Anthem, the IDREs, and the Departments regarding eligibility of the disputes to proceed to the IDR payment determination stage. Defendants had no reasonable grounds on which to believe and represent that the services the Provider Defendants rendered and the disputes they were initiating were eligible for the NSA's IDR process. From the patient's insurance cards, Anthem's EOPs, Anthem's open negotiations and IDR communications to Defendants, the plain text of federal laws and regulations, CMS publications and resources, Defendants' preparation of IDR initiation forms and notices, their participation in the IDR process, and the specific objections to eligibility that Anthem submitted to the Provider Defendants and SCP, the Provider Defendants, SCP, and AGS (through AGS's coordination with SCP and the Provider Defendants) knew or should have known that the services and disputes they were initiating were ineligible for the IDR process.

342. As described above, these false statements, representations, and attestations were submitted by corporate agents and digital workers using corporate email addresses—including

scp.reimbursement@agshealth.com, idram5@scp-health.com, idram3@scp-health.com, and idram6@scp-health.com—which, upon information and belief, was an attempt to conceal the identity of the individuals submitting the false attestations. As parties to IDR have no ability to engage in discovery—in fact, the parties submit final offers and supporting evidence in a blind process without the right or ability to see the other party's submission—the submission of false attestations achieved the concealment of the corporate actors filing the false attestations.

343.  Defendants owed a duty of reasonable care to Anthem, under which they were required to conduct reasonable investigations, ensure the eligibility of the services for which they were initiating the IDR process, and guard against the submission of false attestations of eligibility leading to Anthem to incur fees required by the NSA and IDREs to erroneously issue payment determinations in favor of SCP and the Provider Defendants for items or services that were not eligible for the IDR process. Defendants also owed Anthem a duty of care to submit accurate information to Anthem, the IDREs, and the Departments when they sought payment or additional payment on the medical claims underlying the IDR disputes. Specifically, in making the false representations to Anthem, the IDREs, and the Departments, Defendants were acting in the course of their respective business or professions and each had a pecuniary interest in the underlying medical claims at issue. Moreover, Defendants possessed superior knowledge of the facts underlying the services they (or their clients and co-conspirators in the case of AGS) provided.

344.  As described above, these false statements, representations, and attestations related to dispute eligibility pertain to material facts in the IDR process and Anthem's reliance thereupon because they bypass the safeguards that the Departments created to prevent ineligible disputes and go to the heart of the IDRE's jurisdiction to even hear the dispute.

345.    Anthem was compelled to rely on the false attestations because Anthem was forced to expend resources and incur expenses, including in the form of considerable operational burden and expense and non-refundable administrative fees, and it was forced to proceed to a payment determination, despite the dispute's ineligibility.

346.    According to federal law, "the certified IDR entity selected must review the information submitted in the notice of IDR initiation"—including false attestations of eligibility submitted by AGS in coordination with SCP and the Provider Defendants—"to determine whether the Federal IDR process applies." 45 C.F.R. § 149.510(c)(1)(v). Even if Anthem contested eligibility, the Provider Defendants, SCP, and AGS knew or should have known and expected their deliberate misrepresentations would force Anthem to reasonably and foreseeably rely on the misrepresentations, incur the required administrative fees, and proceed to a payment determination, despite the ineligibility of the dispute.

347.    As described above, these false statements, representations, and attestations were submitted by corporate agents and digital workers using corporate email addresses—including scp.reimbursement@agshealth.com, idram5@scp-health.com, idram3@scp-health.com, and idram6@scp-health.com—which, upon information and belief, was an attempt to conceal the identity of the individuals submitting the false attestations. As parties to IDR have no ability to engage in discovery—in fact, the parties submit final offers and supporting evidence in a blind process without the right or ability to see the other party's submission—the submission of false attestations achieved the concealment of the corporate actors filing the false attestations.

348.    AGS, on behalf of and in coordination with SCP and the Provider Defendants, or SCP on behalf of the Provider Defendants and in coordination with AGS and the Provider Defendants, also falsely represented to Anthem during the statutorily required open negotiations

process that the disputes were eligible for IDR and involved qualified IDR items and services meeting the NSA and regulatory definitions of that term when, in fact, they did not.

349.    As described above, Anthem reasonably, foreseeably, and justifiably relied on these misrepresentations during the open negotiations and IDR initiation process. As part of the fraudulent scheme described herein, Defendants' tactic to strategically flood the IDR process and overwhelm the system precluded Anthem from investigating each and every aspect of the thousands of disputes they submitted within the 30-day open negotiations window or within three days of IDR initiation, intending that Anthem would rely on these false representations of eligibility. Additionally, in some cases (such as when the patient waived balance billing protections), Defendants are the only entities in possession of information critical to Anthem's ability to assess a claim for IDR eligibility, such as information pertaining to the provider, types of services rendered, and patient records. Thus, the Provider Defendants, SCP, and AGS knew or should have known that Anthem was often incapable of knowing the falsity of these misrepresentations. As a result, Anthem justifiably relied on these misrepresentations that the disputes were eligible for IDR and incurred significant monetary losses, including through incurring fees required by the NSA and in the form of IDR payment determinations finding against Anthem.

350.    Defendants owed Anthem a duty of reasonable care to provide accurate information as to the claims and services they were seeking to negotiate in good faith, as they were acting in the course of their respective businesses or professions and each had a pecuniary interest in the underlying medical claims at issue. Moreover, Defendants possessed superior knowledge of the facts underlying the services they (or their clients and co-conspirators in the case of AGS) provided.

351.    Defendants breached these duties identified herein when they (a) falsely represented to Anthem during the statutorily required open negotiations process that the disputes were eligible for IDR and involved qualified IDR items and services meeting the NSA and regulatory definitions of that term when, in fact, they did not and (b) negligently submitted false attestations and made false representations to Anthem, the IDREs, and the Departments.

352.    At all relevant times, Anthem exercised reasonable diligence in investigating the conduct of each of the Defendants with respect to the NSA Scheme.

353.    Each member of the SCP Enterprise formed and operated in a conspiracy to defraud Anthem through this scheme, and each committed acts in furtherance thereof, resulting in the above-stated damages to Anthem.

354.    As a direct and proximate result of Defendants' false statements, representations, and attestations, and Anthem's reasonable reliance on the same, Anthem has suffered substantial damages in the form of payment of fees required by the NSA and on IDR payment determinations that were ineligible for resolution through the NSA's IDR process.

## COUNT VII
## CIVIL CONSPIRACY
### (Against all Defendants)

355.    Anthem repeats and realleges the allegations in Paragraphs 1 through 277 contained in this Complaint as if fully set forth at length herein.

356.    AGS, SCP and the Provider Defendants conspired to implement the fraudulent scheme described herein, resulting in harm to Anthem and conversion of its money.

357.    Specifically, SCP on behalf of and in coordination with the Provider Defendants retained AGS to represent them in the ineligible IDR disputes, including initiating open negotiations, initiating IDR, and the submission of offers and documentation as part of the IDR process.

358.    Each co-conspirator played an integral role in carrying out the fraudulent scheme, including providing funding, directing billing practices, and facilitating the submission of improper claims and IDR proceedings.

359.    As a result of the orchestrated scheme between AGS, SCP and the Provider Defendants to fraudulently submit material misrepresentations to the IDREs and Anthem regarding eligibility of the IDR disputes, Anthem and affiliated health plans have suffered substantial damages in the form of payment of fees required by the NSA and payment of IDR payment determinations that were ineligible for resolution through the NSA's IDR process and conversion of its money.

**COUNT VIII**
**CONVERSION**
**(Against All Defendants)**

360.    Anthem repeats and realleges the allegations in Paragraphs 1 through 277 contained in this Complaint as if fully set forth at length herein.

361.    As described herein, Defendants executed the fraudulent scheme described herein with the intent to defraud Anthem by submitting false attestations of IDR eligibility to Anthem, the IDREs, and the Department that Defendants knew or should have known to be false and falsely representing to Anthem that the disputes were eligible for IDR prior to initiating the IDR process, all done with the intent to obtain money owned or controlled by Anthem under the false pretense that the disputes were eligible for resolution through the IDR process.

362.    In submitting these false attestations of eligibility, AGS, on behalf of and in coordination with SCP and the Provider Defendants, or SCP on behalf of the Provider Defendants and in coordination with AGS and the Provider Defendants, misrepresented material facts to Anthem, the IDREs, and the Departments regarding eligibility of the disputes to proceed to the IDR payment determination stage. From the patient's insurance cards, Anthem's EOBs, the plain

- 98 -

text of federal laws and regulations, CMS publications and resources, Defendants' preparation of IDR initiation forms and notices, their participation in the IDR process, and the specific objections to eligibility that Anthem submitted to SCP and the Provider Defendants, among other sources, the Provider Defendants, SCP, and AGS (through AGS's coordination with SCP and the Provider Defendants) had no reasonable grounds on which to believe and represent that the services and disputes they were initiating were eligible for the IDR process.

363.    As a result of these fraudulent schemes, the Defendants wrongfully exercise dominion or control over identifiable sums of money rightfully owned by Anthem. *See supra* Part III of the SCP Enterprise (identifying specific amounts of money owed to Anthem from exemplar IDR proceedings).

364.    Given the vast scope of Defendants' fraudulent schemes, the exact amount of money wrongfully controlled by Defendants must be determined at trial after discovery has been taken, nonetheless, upon information and belief, the amount of money wrongfully controlled by Defendants exceeds several millions of dollars.

365.    The several millions of dollars wrongfully controlled by Defendants is both readably identifiable and traceable as all money was fraudulently obtained by Defendants via specific recorded payments made by Anthem in satisfaction of identifiable, fraudulently obtained IDR determinations.

366.    At the time of these fraudulent schemes Anthem was the rightful owner of the several millions of dollars now wrongfully controlled by Defendants.

367.    Anthem was under no other obligation to pay these sums to Defendants, but for the fraudulently obtained IDR determinations.

368. Anthem remains the rightful owner of the several millions of dollars wrongfully controlled by Defendants.

369. As a direct result of Defendants' fraudulent schemes, Anthem has been deprived of possession and seeks the return of the several millions of dollars wrongfully controlled by Defendants.

**COUNT IX**
**VACATUR OF NSA IDR AWARDS (brought in the alternative)**
**(Against All Defendants)**

370. Anthem repeats and realleges the allegations in Paragraphs 1 through 277 contained in the Complaint as if fully set forth at length herein.

371. In the alternative to seeking relief on the aforementioned counts, Anthem seeks vacatur of individual IDR determinations under 42 U.S.C. § 300gg-111(c)(5)(E).

372. Each individual IDR determination at issue was procured by undue means and fraud, warranting vacatur pursuant to 42 U.S.C. § 300gg-111(c)(5)(E) and 9 U.S.C. § 10(a)(1).

373. For each individual IDR determination at issue, the IDREs exceeded their powers by issuing payment determinations on items and services that are not qualified IDR items and services within the scope of the NSA's IDR process. This warrants vacatur pursuant to 42 U.S.C. § 300gg-111(c)(5)(E) and 9 U.S.C. § 10(a)(4).

374. Defendants improperly obtained payment determinations under the NSA by misrepresenting that the services were qualified IDR items or services, warranting vacatur of such determinations under 9 U.S.C. § 10(a) and 42 U.S.C. § 300gg-111(c)(5)(E).

375. The IDR payment determinations at issue were procured by undue means and misrepresentation.

376. For the IDR payment determinations at issue, the IDREs exceeded their powers by issuing payment determinations on items and services that are not qualified IDR items and services within the scope of the NSA's IDR process.

377. AGS, SCP and the Provider Defendants continue to obtain awards by undue means and fraud, and the IDREs continue to exceed their powers by issuing payment determinations on items and services that are not qualified IDR items and services within the scope of the NSA's IDR process. Thus, the list of IDR payment determinations subject to vacatur is expected to increase during the pendency of the case.

**COUNT X**
**ERISA § 502(a)(3)**
**(Against All Defendants)**

378. Anthem repeats and realleges the allegations in Paragraphs 1 through 277 contained in this Complaint as if fully set forth at length herein.

379. Anthem provides claims administration services for certain health benefit plans governed by ERISA. Those health benefit plans and their employer sponsors delegate to Anthem discretionary authority to recover overpayments, including those resulting from fraud, waste, or abuse. They also delegate the authority to Anthem to administer the IDR process for the plans, including the discretionary authority to perform other services incident or necessary to Anthem's administration of the IDR process.

380. ERISA authorizes a fiduciary of a health plan to bring a civil action to "enjoin any act or practice which violates any provision of this subchapter or the terms of the plan" or "to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

381. Section 1185e of ERISA sets out the rights and obligations of plans and medical providers with respect to the IDR process, including that the IDR process does not apply in

situations where there is a specified state law, where the provider is a participating provider, and where the provider has not initiated or engaged in open negotiations. 29 U.S.C. § 1185e.

382.    Through the acts described herein, Defendants have caused and continue to cause the overpayment of funds on behalf of ERISA-governed benefit plans through conduct that violates Section 1185e of ERISA.

383.    Defendants are continuing to engage in such improper conduct, including but not limited to failing to properly initiate or engage in open negotiations prior to initiating the IDR process, initiating IDR for services subject to Virginia's balance billing laws, initiating IDR with respect to claims that Anthem denied and thus are exempt from the IDR process, and failing to comply with other NSA requirements such as the IDR batching rules or the cooling off period. This conduct causes ongoing harm to Anthem and the ERISA-governed benefit plans.

384.    There is an actual case and controversy between Anthem and Defendants relating to the claims fraudulently submitted and arbitrated as part of the NSA's IDR process.

385.    Anthem seeks an order enjoining Defendants from:

a.   Initiating IDR without first properly initiating and engaging in open negotiations;

b.   Initiating IDR for services subject to Virginia's balance billing laws;

c.   Initiating IDR for services that Anthem denied and thus are not eligible for IDR; and

d.   Initiating IDR for services when Defendants failed to comply with other NSA requirements such as the deadline to initiate IDR following open negotiations.

## **PRAYER FOR RELIEF**

WHEREFORE, Anthem respectfully requests that the Court:

a. Award monetary damages to the full extent allowed by law, including, but not limited to, compensatory damages, punitive damages, and treble damages;

b. Relief from all improperly-obtained NSA IDR awards;

c. Declaratory relief in the form of an order finding that Defendants' conduct in submitting false attestations and initiating IDR for unqualified IDR items or services is unlawful;

d. Declaratory relief in the form of an order finding that IDR awards for such unqualified IDR items or services are not binding;

e. Injunctive relief prohibiting Defendants from continuing to submit false attestations and from continuing to initiate IDR for items or services that are not qualified for IDR, or from seeking to enforce non-binding awards entered on items and services not qualified for IDR;

f. Declare that IDR awards issued on unqualified IDR items or services are non-binding and are not payable on a go-forward basis; and

g. Award pre- and post-judgment interest;

h. Award costs, attorney's fees, and interest;

i. In the alternative, grant vacatur of the underlying IDR determinations; and

j. Grant such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Anthem demands a trial by jury on all issues so triable.

Dated: November 5, 2025

Respectfully submitted,

*/s/ Jed Wulfekotte*_____
Jed Wulfekotte
VA Bar No. 73538
Attorney for Plaintiffs Anthem Health Plans of
Virginia, Inc. d/b/a Anthem Blue Cross and Blue
Shield and Healthkeepers, Inc.
**Crowell & Moring LLP**
1001 Pennsylvania Ave. NW
Washington, DC 20004
Tel: (202) 624-2693
Fax: (202) 628-5116
jwulfekotte@crowell.com


Martin J. Bishop (*pro hac vice* forthcoming)
Illinois Bar No. 6269425
Alexandra M. Lucas (*pro hac vice* forthcoming)
Illinois Bar No. 6313385
Jason T. Mayer (*pro hac vice* forthcoming)
Illinois Bar No. 6309633
**Crowell & Moring LLP**
455 N. Cityfront Plaza Drive
Suite 3600
Chicago, IL 60611
Tel: (312) 321-4200
mbishop@crowell.com
alucas@crowell.com
jmayer@crowell.com

*Attorneys for Plaintiffs Anthem Health Plans of
Virginia, Inc. d/b/a Anthem Blue Cross and Blue
Shield and Healthkeepers, Inc.*